**LAC du FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; and the Sokaogon Chippewa Community, Plaintiffs,**

v.

**STATE OF WISCONSIN; Tommy G. Thompson, Governor of the State of Wisconsin; Donald J. Hanaway, Attorney General of the State of Wisconsin; David Vernon Penn, District Attorney of Vilas County, Wisconsin; and Janet L. Marvin, District Attorney of Forest County, Wisconsin, Defendants.**

No. 90–C–408–C.

United States District Court,
W.D. Wisconsin.

July 18, 1990.

Bruce R. Greene, Boulder, Colo., and Milton Rosenberg, Madison, Wis., for plaintiffs.

Edward S. Marion, Madison, Wis., for defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for declaratory and injunctive relief in which two federally acknowledged Indian tribes seek enforcement of provisions of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* In addition, the tribes seek to enjoin defendants from initiating any criminal process against them, their governing tribal councils, their casino employees, suppliers or patrons during the pendency of this action and thereafter.

Jurisdiction is invoked pursuant to 28 U.S.C. § 1362 and 25 U.S.C. § 2710(d)(7)(A)(i).

The case is before the court on plaintiffs' motion for a preliminary injunction prohibiting defendants from initiating criminal process against plaintiffs for violation of state gambling laws.

I conclude that the state lacks authority to prosecute violations of the state's gambling laws on plaintiffs' reservations, either pursuant to the provisions of Pub.L. 280 incorporated in 18 U.S.C. § 1162, or pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* and 18 U.S.C. § 1166. Unless and until the state negotiates a tribal-state compact in which plaintiffs consent to the exercise of such jurisdiction, the United States has the exclusive authority to enforce violations of state gambling laws on plaintiffs' reservations. However, I decline to grant the injunction sought by plaintiffs to enjoin defendants from prosecuting any future violations of the state gambling laws on the reservations. Plaintiffs can avoid any harm they might incur from being subjected to prosecution by a sovereign that lacks jurisdiction simply by refraining from engaging in criminal acts. They do not need an injunction.

For the purpose only of deciding this motion, I find that there is no dispute about the following findings of fact proposed by plaintiffs and uncontroverted by defendants.

## FACTS

### I. LAC DU FLAMBEAU BAND

The Lac du Flambeau Band of Lake Superior Chippewa Indians is an Indian tribe acknowledged by the United States in the treaty with the Chippewa of September 30, 1854, 10 Stat. 1109. The band occupies a reservation located primarily in Vilas County, Wisconsin.

The band has an approved tribal membership roll of 2,310 members. Most reservation residents live in households with income below the poverty level. Of the on-reservation member population at Flambeau, 63% are unemployed. Of those employed, 23% have incomes below $7,000 a year.

The band exercises governmental authority over its reservation and its members through its Tribal Council. The band makes continuous efforts to provide employment opportunities for its members.

Pursuant to the powers set forth in the band's constitution, in January 1988, the Tribal Council adopted a comprehensive Gaming Ordinance that regulates the various forms of gaming conducted on the reservation.

On May 17, 1989, the band opened a gaming facility on federal trust lands within the reservation. The band owns and operates the casino itself. It does not contract with an outside management company.

Between May 17, 1989 and mid-February 1990 the casino employed approximately 24 to 29 persons. In May 1989 83% of the employees were tribal members; in February 1990 just under 80% of those employed were tribal members.

In the absence of the casino jobs, it is likely that the tribal member employees will not find replacement jobs, will be unemployed, and will be forced to rely on some form of public assistance relief from the state or federal government and from tribal social services programs.

The Lac du Flambeau Band supplies many essential governmental services such as housing, water, sewer and related sanitation services, education, medical, dental, psychological, counselling and sanitarium services. Its total annual operating expenditures for the provision of services and the operation of tribal government are approximately $4 million annually. Although it receives funds to operate its governmental programs and services from a variety of sources including the federal government, its ability to provide a full range of services to its members is limited by restrictions on the use of the funds.

The band has only a few, very limited taxing opportunities within the reservation. Consequently, it tries to raise unrestricted funds to fill the unmet needs of its members through the leasing of tribal land, cigarette sales and licenses of various kinds, and the casino operation. Without casino revenue, the band will not be able to support tribal programs and services. Casino revenues are projected to produce over 15.79% of the General Fund revenues available for tribal expenditure in FY 1990. In fact, however, actual casino revenues have exceeded projections, and have accounted for a larger share of the General Fund revenues than originally anticipated.

Between May 17, 1989 and mid-February 1990, the following games have been played at the tribal casino: bingo-jack, bingo-letter, video machines, pull-tabs, quick bingo (20–20), poker and blackjack.

## II. SOKAOGON CHIPPEWA COMMUNITY

The Sokaogon Chippewa Community is one of the original Lake Superior Chippewa Bands recognized in treaty. For many decades it was a so-called "lost tribe," subsisting in the ceded territory without benefit of a permanent home or the assistance of federal trusteeship. In the 1930s, the community received a small parcel of 1860 acres of land in Forest County, Wisconsin, which is its reservation home. Approximately 430 tribal members of a total membership of about 1,350 live on the Sokaogon Reservation. The reservation has almost no natural resources capable of producing income and it has no viable tax base. The tribe's unemployment rates exceed 85%.

Since at least 1987, the tribe has operated approximately 15 video poker facsimile games. In the latter part of 1989 these machines were supplemented by four blackjack tables and some slot machines.

The Sokaogon gaming enterprise is managed and operated exclusively by tribal personnel. Until it was threatened with prosecution, it employed at least ten persons full-time (six men and four women) as well as part-time workers, and had a payroll of at least $10,000 per month. During the period of its operation, the enterprise generated net profits of over $15,000 a month in addition to its tribal payroll. The 12–month projection is that the enterprise will generate gross revenues of over $290,-000 a year and support a tribal payroll of over $110,000 a year. The projected net profit in excess of $175,000 would provide the tribe with its major source of discretionary funds.

The Sokaogon Chippewa Community is the local government with direct and immediate responsibility for the welfare of its reservation residents. Its assets are slim. It is assisted by numerous programs funded by federal and state governments. However, all such funding must be strictly administered according to program plan. There is no allowance for emergency or the recognition of need extending beyond program coverage.

The gaming revenues afford the major source of funds that enable the Tribal Council to carry out its responsibility to minister to the needs of its residents.

The Sokaogon Community operated its gaming enterprise openly and with the full endorsement of local law enforcement offi-

cials until defendant Marvin threatened the enterprise with prosecution and seizure.

Continued closure of the enterprise for an extended period will relegate at least ten employees to unemployment and the relief rolls, and deprive the tribe of badly needed funding for essential programs. Closure of the enterprise for an extended period will also destroy the patronage and business relationships that have been built up over a period of years, and will dissipate the training, confidence and business experience tribal members have acquired.

## OPINION

### I. INDIAN GAMING REGULATORY ACT

The background to this litigation is the 1988 Indian Gaming Regulatory Act, which establishes a comprehensive scheme for the regulation of gaming on Indian lands. The Act is a response to congressional concerns over the increasing reliance by Indian tribes on revenues from gaming activities conducted on Indian lands and the lack of clear standards or regulations for the conduct of such activities.

Under the Gaming Act, gaming is divided into three categories. Class I gaming includes social and traditional forms of Indian games played by individuals at pow wows and tribal ceremonies for minimal prizes. 25 U.S.C. § 2703(6). Class I games are subject to exclusive tribal jurisdiction and regulation. 25 U.S.C. § 2710(a)(1).

Class II gaming includes bingo, pull-tabs, lotto, tip-jars, punch boards, instant bingo, and other games similar to bingo. 25 U.S.C. § 2703(7)(A)(i). Class II gaming is subject generally to the jurisdiction of a newly created National Indian Gaming Commission, 25 U.S.C. § 2704(a) and (b)(1) and § 2710(b)(1) through (c). In certain circumstances, tribes may regulate their own Class II gaming if they are licensed by the Commission. 25 U.S.C. § 2710(c)(3) and (4).

Class III games are all forms of gaming that are neither class I nor Class II. 25 U.S.C. § 2703(8). Class III games are lawful on Indian lands if the activities are authorized by a tribal ordinance or resolution that has been approved by the Chairman of the National Indian Gaming Commission; if they are carried on within a state "that permits such gaming for any purpose by any person, organization or entity. . . ." 25 U.S.C. § 2710(d)(1)(A) and (B); and if they are played in conformance with a tribal-state compact entered into between the tribe and the state, 25 U.S.C. § 2710(d)(1)(C).

Tribal-state negotiations for a Class III compact are initiated by tribal request. 25 U.S.C. § 2710(d)(3)(A). Thereafter, the state must negotiate in good faith to enter into such a compact. *Id.* If a state fails to enter into negotiations with a tribe, or negotiates in bad faith, the Act authorizes the tribe to initiate litigation in federal court. If the court finds the state has failed to negotiate in good faith, it is to order the parties to conclude a compact within 60 days, and, failing that, to submit to a court-appointed mediator a compact that represents their last best offers, from which the mediator selects one. 25 U.S.C. § 2710(d)(7)(B)(iv).

The structure of the Indian Gaming Regulatory Act conforms to the basic principle that the state and tribe negotiate as sovereigns. The Act acknowledges the inherent rights of the tribes and allows them to relinquish some of them through compacts. *See* remarks of Sen. Evans, 134 Cong.Rec. 3105 (1988).

### II. THE PARTIES' POSITIONS

On this motion for preliminary injunction the plaintiffs are challenging only the jurisdiction of the state to prosecute them criminally for gambling violations. Although plaintiffs' suit is directed primarily to the claim that the state has failed to negotiate a class III compact in good faith, thereby entitling plaintiffs to come to federal court to initiate litigation against the state for bad faith negotiations, their motion is not directed to the state's sincerity or lack of sincerity in negotiating. They have proposed no facts on that issue and defendants have not had a chance to be heard on it. I emphasize this point because plaintiffs

have not made it completely clear in their submissions. Clarification of the issue in dispute is important to determining the basis for jurisdiction, the identification of the proper defendants, and the nature of the harms at stake.

Plaintiffs assert that the Indian Gaming Regulatory Act gives the United States exclusive jurisdiction over alleged violations of state gambling laws on Indian lands and that the State of Wisconsin's district attorneys lack jurisdiction to prosecute any violation of state gambling laws on Indian lands in the absence of a tribal-state compact. Plaintiffs urge the court to recognize this exclusive jurisdiction by enjoining the defendant district attorneys from initiating any criminal actions to enforce the state's gambling laws on the plaintiffs' reservations.

Defendants dispute plaintiffs' assertion that the Indian Gaming Regulatory Act took away the criminal jurisdiction over gambling on Indian lands that the State of Wisconsin possesses under Pub.L. 280, 18 U.S.C. § 1162. They maintain that the state retains jurisdiction over Indian gambling that the defendant district attorneys may exercise.

Defendants argue, correctly, that the jurisdictional basis for this motion is 28 U.S.C. § 1362, the Indian federal question statute, and not the Indian Gaming Regulatory Act. The issue arises under the supremacy clause of the United States Constitution. If plaintiffs are correct in their contention that the state has no jurisdiction to prosecute gambling under the Indian Gaming Regulatory Act, the defendant district attorneys would be violating the supremacy clause if they were to attempt to exercise jurisdiction over plaintiffs.

I turn next to the question whether Pub.L. 280 would authorize the state to exercise criminal jurisdiction over plaintiffs' on-reservation gambling activities. Resolution of this question is material to interpreting the language of 18 U.S.C. § 1166, the criminal penalty and enforcement provision of the Indian Gaming Regulatory Act, and to determining defendants' claim that the state retains its authority to bring criminal proceedings against the plaintiffs for violations of the state's gambling laws.

### III. STATUS OF CASINO ACTIVITY UNDER PUBLIC LAW 280

#### A. Nature of Casino Activity

Neither side has submitted factual descriptions of the kinds of games that plaintiffs offer or intend to offer in their casinos. The parties concede, however, that most of the games fall into the class III category for which a compact is required. Plaintiffs do not deny that class III games are illegal under the Indian Gaming Regulatory Act in the absence of a tribal-state compact.

#### B. Public Law 280

In 1953 Wisconsin was one of six states (including the then territory of Alaska) to which Congress gave limited civil and general criminal jurisdiction in certain areas of Indian country within their borders. Act of August 15, 1953, Pub.L. No. 83-280, 67 Stat. 588, 18 U.S.C. § 1162 and 28 U.S.C. § 1360 (commonly known as Public Law 280). As a result, Wisconsin has criminal jurisdiction over offenses committed by or against Indians in all Indian country within the state, with the exception of the Menominee Reservation, "to the same extent that [it] has jurisdiction over offenses committed elsewhere within the State...." 18 U.S.C. § 1162(a). "Indian country" includes all land within the limits of any Indian reservation under federal jurisdiction, all dependent Indian communities, and all Indian allotments to which the Indian titles have not been extinguished. 18 U.S.C. § 1151.

The civil jurisdiction given the Pub.L. 280 states was limited and specific. In *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court made it clear that the law did not confer upon states and their subdivisions a general grant of power to tax personal property on Indian land. Rather, the grant of civil jurisdiction was intended primarily to redress the lack of adequate Indian fo-

rums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens.

*Bryan* has been read consistently as directing an analysis of the nature of the laws a state wishes to enforce in Indian country. The courts are to look beyond the state's characterization of a law as criminal or civil to determine whether the law is one that is prohibitory in nature, that is, intended to prohibit acts the state believes are inimical to the health and safety of its citizens or whether it is one that is essentially regulatory, that is, intended to regulate acts that the state permits in certain restricted circumstances. Under this criminal-prohibitory, civil-regulatory analysis, the State of Washington's fireworks laws were found to be prohibitory rather than regulatory. They outlawed completely the general possession and sale of dangerous fireworks, with certain limited exceptions, and were designed to promote the health and safety of the state's citizens. *United States v. Marcyes*, 557 F.2d 1361 (9th Cir. 1977). Laws prohibiting bingo games have been found to be regulatory in nature in states that impose criminal penalties on persons who run unauthorized bingo games for profit, but permit such games when run by certain groups under state regulation. *See, e.g., Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir.1982); *Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (5th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Mashantucket Pequot Tribe v. McGuigan*, 626 F.Supp. 245 (D.Conn.1986); *Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 518 F.Supp. 712 (W.D.Wis.1981).

The civil-regulatory, criminal-prohibitory dichotomy derived from *Bryan* was adopted by the Supreme Court in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 210, 107 S.Ct. 1083, 1089, 94 L.Ed.2d 244 (1987). The Court held that two federally recognized Indian tribes could conduct high stakes bingo, draw poker, and other card games free from criminal prosecution by the State of California. The state had sued to stop the tribes' games under its gambling laws, which permitted bingo games only under certain very limited conditions and made violations of any of the conditions a misdemeanor. In concluding that the state could not enforce its criminal laws against gaming activities, the Court found it persuasive that the Court of Appeals for the Ninth Circuit had held the California gambling laws to be civil-regulatory. The Court found that the court of appeals had a "fair basis" for its conclusion.

> California does not prohibit all forms of gambling. California itself operates a state lottery, Cal.Govt.Code Ann. § 8880 *et seq.* (West Supp.1987), and daily encourages its citizens to participate in this state-run gambling. California also permits parimutuel horse-race betting. Cal. Bus. & Prof.Code Ann. §§ 19400–19667 (West 1964 and Supp.1987). Although certain enumerated gambling games are prohibited under Cal.Penal Code Ann. § 330 (West Supp.1987), games not enumerated, including the card games played in the Cabazon card club, are permissible. The Tribes assert that more than 400 card rooms similar to the Cabazon card club flourish in California, and the State does not dispute this fact.

*Id.* at 210, 107 S.Ct. at 1089.

Like California, Wisconsin does not prohibit all forms of gambling. The state's first constitution included an anti-lottery provision that prohibited the legislature from ever authorizing a lottery. Wis. Const., art. IV, § 24. For more than a century, this provision was interpreted by the state courts and by the attorney general as prohibiting any game of chance involving the elements of prize, chance and consideration. However, in the last three decades, the electorate has approved amendments to the constitution that authorize the state to operate a lottery, with the proceeds going to property tax relief, Wis. Const. Art. 4, § 24(6), Wis.Stat. § 565.01 *et seq.*, and permit state-licensed bingo games and raffles, Wis. Const. Art. 4, § 24(3), Wis.Stat. ch. 163, and dog, horse, and snowmobile racing with on-track parimutuel betting, Wis. Const. Art. 4, § 24(5), Wis. Stat. § 562.001 *et seq.* The relevant provision of the state constitution now begins:

"Except as provided in this section, the legislature shall never authorize any lottery...."

These amendments raise the question whether the state can continue to assert that any of its gambling laws are criminal-prohibitory, and therefore enforceable under Pub.L. 280. I conclude it cannot. Although defendants maintain that the amendments are carefully drawn exceptions to a strong state policy of opposition to gambling and that the kind of games plaintiffs intend to offer in their casinos can be readily distinguished from the narrow range of activities the state's electorate has voted to except from the constitutional ban on lotteries, defendants' position cannot be reconciled with the holding in *Cabazon* or with the broad scope of the constitutional amendments.

In *Cabazon*, the Court looked at California's policy toward gaming in general in reaching the conclusion that the policy was civil-regulatory in nature. "In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates, rather than prohibits gambling in general and bingo in particular." *California v. Cabazon Band*, 480 U.S. at 211, 107 S.Ct. at 1089. In Wisconsin, as in California, the state permits such extensive gambling activity as to make it clear that its view of the activity in general is regulatory and not prohibitory. *Cabazon* establishes the proposition that in making the Pub.L. 280 analysis, the question is whether the state views the activity of gambling in general as so dangerous to the health and safety of its citizens that it must be wholly prohibited. "The shorthand test is whether the conduct at issue violates the State's public policy." *Id.* at 209, 107 S.Ct. at 1088. If it does not, the conduct cannot be enforced by the state.[1]

Wisconsin's public policy has been expressed by the electorate. The state's voters have approved referenda to amend the state's constitution to permit a wide range of gambling activity. The state has undertaken not just to permit gambling but to facilitate it through the institution of a state lottery. Having done so, the state can no longer argue that it has a public policy of opposition to any particular form of gambling activity.

Indeed, there is a strong argument to be made that when the electorate amended the constitution to allow a lottery, it eliminated any remaining constitutional prohibition against any form of gambling. Throughout Wisconsin's statehood, its courts have read the constitutional prohibition against "lotteries" as prohibiting any game involving the elements of prize, chance and consideration. *See, e.g., Kayden Indus., Inc. v. Murphy*, 34 Wis.2d 718, 150 N.W.2d 447 (1967). For example, the state supreme court has read the anti-lottery provision to cover theater promotions, *State ex rel. Cowie v. La Crosse Theaters Co.*, 232 Wis. 153, 286 N.W. 707 (1939); mercantile promotions, *State ex rel. Regez v. Blumer*, 236 Wis. 129, 294 N.W. 491 (1940); charitable bingo, *State ex rel. Trampe v. Multerer*, 234 Wis. 50, 289 N.W. 600 (1940); and television games of chance, *State v. Laven*, 270 Wis. 524, 71 N.W.2d 287 (1955). The state's attorneys general have issued opinions to the effect that the prohibition against lotteries encompasses slot machines and pinball machines, 32 Op.Att'y Gen.Wis. 181 (1943), mechanical devices ringing at pre-set intervals to provide ticket purchases with free tickets, 28 Op.Att'y Gen.Wis. 457 (1939), and "Las Vegas Nights" (event at which guests purchase play money to use at gambling tables and then bid for prizes with their winnings), 70 Op. Att'y Gen.Wis. 59 (1981). Now that the electorate has voted to allow state-operated lotteries, it follows that it has voted for the elimination of the prohibition of any game involving the elements of prize, chance and consideration.

1. *Pueblo of Santa Ana v. Hodel*, 663 F.Supp. 1300 (D.D.C.1987) is not to the contrary. In that case, the question was whether New Mexico's statutes permitting gambling on horse racing evidenced a state policy that would allow gambling on any kind of animal racing. The district court held that it did not, noting that New Mexico had carefully limited parimutuel betting to horse racing. Although defendants argue that Wisconsin's laws show similar narrow exceptions, a review of the law does not support their characterization.

Defendant Hanaway has reached a contrary conclusion. In a recent opinion issued February 5, 1990, he argues that the term "lottery" as used in the state constitution was never intended to cover all of the different forms of gambling, specifically, betting against a bank as in blackjack, roulette, craps, chemin de fer, baccarat, and similar games, and playing gambling machines such as slot machines, video gambling machines, and similar devices. He concludes that, in approving a constitutional amendment to permit a state-run lottery, the voters intended to limit the types of permitted games to those requiring "tickets" in the conduct of the game, and that because casino-style gambling is not a lottery, the legislature is free to allow it in the state simply by repealing or modifying the criminal statutes that presently prohibit it.

I find this opinion difficult to square with the state's consistent treatment of lottery as an inclusive term of reference to any type of gambling involving chance, consideration and prize. In any event, it does not change my view that, with the passage of the amendment to the Wisconsin Constitution permitting a state lottery and parimutuel betting, the state expressed its view that gambling in and of itself is not a threat to the health and safety of its citizens, but an activity to be permitted subject to regulation. As a consequence, enforcement of gambling laws now falls into the civil-regulatory category over which the state has no jurisdiction under Pub.L. 280.

Whether this analysis of Pub.L. 280 has any relevance to the requirement in 25 U.S.C. § 2710(d)(1)(c) that a particular gambling activity may be authorized by tribal-state compact only if it is carried on within a state "that permits such gaming for any purpose...." is a matter on which I reserve comment expressly at this time.

## IV. PREEMPTION OF STATE CRIMINAL JURISDICTION UNDER THE INDIAN GAMING REGULATORY ACT

█ Even if the state had not lost its Pub.L. 280 jurisdiction to prosecute violations of state gambling laws in Indian country, the passage of the Indian Gaming Regulatory Act has preempted it from exercising criminal jurisdiction over gambling activities on the reservations in the absence of a tribal-state compact that confers such authority on the state by agreement. 18 U.S.C. § 1166(d) gives the United States "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country." The statute reads in full as follows:

**Gambling in Indian Country.** (a) Subject to subsection (c), for purposes of Federal law, all State laws pertaining to licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.

(b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

(c) For the purpose of this section, the term "gambling" does not include—

(1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or

(2) class III gaming conducted under a Tribal–State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act that is in effect.

(d) The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws

that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal–State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act, or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.

Despite the plain language of subsection (d), defendants contend that the state continues to have jurisdiction to prosecute Indian violations of state gambling laws. They argue that the United States has exclusive criminal jurisdiction over only those state gambling laws that are made applicable to Indian country under § 1166; Wisconsin's gambling laws were made applicable to Indian country within this state under Pub.L. 280; therefore, the state retains its authority to enforce state laws on the reservations. Alternatively, defendants argue that the passage of Pub.L. 280 was the equivalent of consent by Wisconsin's Indian tribes to transfer criminal jurisdiction over gambling to the state. Neither argument stands up to close analysis.

As I have found, Wisconsin has lost its Pub.L. 280 authority to prosecute Indian gambling. Defendants' reading of § 1166 would mean that Indian gambling within the state would be free from any enforcement: the state could not enforce its criminal laws because gambling is not a criminally prohibited activity under Pub.L. 280, and the federal government could not act because there would be no laws applicable to the reservations.[2]

Defendants' argument rests on the faulty premise that Congress did not intend to include the Pub.L. 280 states in its carefully wrought scheme for regulating gambling in Indian country. In those six states, the applicability of state gambling laws would continue to be determined under the civil-regulatory, criminal-prohibitory dichotomy approved in *Cabazon*.

This flies in the face of common sense. As both this case and *Cabazon* demonstrate, there is considerable confusion about the extent to which the gaming laws of the Pub.L. 280 states can be enforced by those states on Indian reservations. To let that confusion continue and, in effect, leave the Pub.L. 280 states out of the Gaming Act's coverage, would not advance the congressional purpose of developing a comprehensive, national scheme for regulating ongoing gaming activities on Indian reservations throughout the country. 25 U.S.C. § 2701.

The congressional history shows that Congress was aware of the *Cabazon* case, *see* S.Rep. No. 100–446, 100th Cong., 2d Sess. 6 (1988) U.S.Code Cong. & Admin. News 1988 pp. 3071, 3075, and aware that the Pub.L. 280 states were losing their authority to enforce their gambling laws in Indian country. As more of the Pub.L. 280 states adopted lotteries and permitted other forms of gambling in efforts to increase their revenues without raising taxes, Pub.L. 280 jurisdiction over Indian gambling was eroding rapidly. It would have been nonsensical for Congress to place any reliance on that legislation in its efforts to bring control and uniformity to Indian gambling.

There is even less force to defendants' second argument that the state retains jurisdiction over gambling violations by virtue of the exception in subdivision (d) for consensual transfer by a tribe of criminal jurisdiction with respect to gambling. Defendants offer no legislative history, statutory provision or case law that would support reading Pub.L. 280 as a law to which the Indians in Wisconsin "consented." In fact, the tribes had no say in the legislation. It was imposed upon them by Congress in its capacity of trustee over the nation's Indian tribes. The legislative history leaves no doubt that the consensual transfer provision in § 1166(d) did not refer to the Pub.L.

---

**2.** Although it may seem anomalous that the same state gambling laws that cannot be enforced on the reservations by the state pursuant to its Pub.L. 280 authority are made applicable to the reservations by 18 U.S.C. § 1166, the explanation is that the state laws referred to in § 1166 are in fact federal laws incorporating state laws. There is no question about the authority of the federal government to make and enforce laws on the Indian reservations.

280 transfer of jurisdiction by fiat, but to a recent Indian land claims settlement in Rhode Island and to similar settlements of Indian land controversies that might be reached in the future.

## V. ELEMENTS OF PRELIMINARY INJUNCTION SHOWING

 The parties agree that a movant seeking a preliminary injunction must establish the ultimate likelihood of success on the merits of its claim, the lack of an adequate remedy at law, irreparable harm if the injunction is not issued, the probability that it will suffer greater harm if the injunction does not issue than its opponent will suffer if the injunction does issue, and finally, that the public interest will not be disserved by the issuance of the injunction. *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 387–388 (7th Cir.1984).

Plaintiffs argue that the irreparable harm they will suffer is clear from their showing of the poverty and lack of job opportunities on their reservations; that the harm to the defendants is minimal if the injunction issues, because the state showed no concern about the operation of the casinos from May 1989 to mid-February 1990; and that an injunction would not disserve the public interest but would be helping to carry out the congressional intent expressed in the Indian Gaming Regulatory Act.

Defendants see the controversy through a different prism. They do not deny that the casinos provide badly needed jobs and revenue for the reservations. However, they maintain that casino activity is illegal in the absence of a tribal-state compact, and that plaintiffs cannot claim they are suffering irreparable harm by being denied the opportunity to engage in illegal activity. Furthermore, plaintiffs cannot claim that the harm they will suffer as a result of being denied an injunction is greater than the harm the state will suffer if plaintiffs are permitted to engage in illegal activities, or that the public interest will be served by entry of an injunction. Finally, defendants argue, plaintiffs have an adequate remedy at law: they can assert the exclusivity of federal jurisdiction over alleged gambling violations on Indian lands as a defense to any criminal prosecutions brought against them.

Defendants are correct that the tribes cannot satisfy the irreparable harm requirement by showing the harm to the tribes and their programs resulting from the loss of casino revenue. It is not only the threat of prosecution by the state that prevents plaintiffs from operating their casinos; it is the fact that the activities they would offer in the casinos are illegal under the Indian Gaming Regulatory Act unless they are authorized by tribal-state compacts. Even if plaintiffs succeed in obtaining an injunction prohibiting the state from prosecuting them, they cannot operate their casinos with impunity: they remain subject to prosecution by the United States Attorney for violations of the gaming act.

The only harm that can be attributed to defendants' threats of prosecution is the harm plaintiffs would suffer by being subjected to criminal prosecution by a sovereign that lacks jurisdiction over them. However, they will be vulnerable to such harm only if they choose to offer class III gaming activities on their reservations.

So stated, the request for a preliminary injunction becomes questionable. If plaintiffs do not intend to resume class III gambling, the threat of prosecution is of no actual consequence and plaintiffs' only viable claim of irreparable harm must fail. Plaintiffs have not alleged that defendants have threatened to prosecute them for any acts committed previously, while the casinos were in operation. They do not contend that theirs is a situation in which they risk criminal prosecution because of a lack of clear standards, so that they might break the law unwittingly, *see, e.g., Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (state officials enjoined from prosecuting or threatening to prosecute plaintiffs for alleged violations of two Louisiana statutes that plaintiffs claimed were overbroad), or that their so-called illegal activity is actually constitutionally protected, *see, e.g., Miller v. Civil City of South Bend*, 904 F.2d 1081 (7th Cir.1990) (en banc) (city barred from en-

forcing unconstitutional Indiana law making non-obscene nude barroom dancing criminal).

On the other hand, if plaintiffs do intend to offer class III gambling before concluding a tribal-state compact, they will be in violation of the gaming law, and they are in no position to ask for equitable relief. It is a basic tenet of equity jurisprudence that a court may not aid the accomplishment of acts that would violate the law, or would otherwise disserve the public interest.

It is true that the "illegal" activity at issue is illegal only because it is not yet authorized by a tribal-state compact, and that it is not the kind of illegal activity that offends the state's public policy. It is also true that the state would be acting illegally if it tried to prosecute the tribes or their members or their employees, and that the plaintiffs would incur actual harm for which money damages would not be available were such prosecutions to take place.[3] Despite these considerations and despite the strong showing the plaintiffs have made of ultimate success on the merits, I conclude that plaintiffs are in no position to seek equitable relief for any harm that would result from the state's illegal prosecution. Plaintiffs can avoid that harm by refraining from operating class III gambling in violation of federal gaming regulations.

Having reached this conclusion, I need not address defendants' contention that only the defendant district attorneys have the authority to prosecute plaintiffs and that any injunction should issue only against them.

### ORDER

IT IS ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.

---

**3.** The possibility that plaintiffs could be subjected to numerous criminal prosecutions brought in the absence of a good faith basis for jurisdiction distinguishes plaintiffs' situation from that in *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971), in which the Supreme Court held that undergoing a single criminal prosecution brought in good faith is not such a great and immediate harm as to justify federal court interference with the prosecution.