Dear Senate, Enoch Kelly Haney,
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following questions:
1. Without a cross deputization agreement with the Bureau ofIndian Affairs, does a state or local law enforcement officerhave the authority to arrest an individual for the commission ofa federal crime in Indian country within the State of Oklahoma?
 2. For the purposes of law enforcement, may state and localagencies enter into cross-deputization agreements with a branchof the federal government, specifically the Bureau of IndianAffairs (whose cross-deputization agreements are titled "DeputySpecial Officer Commissions," hereinafter called "DSO's") withoutviolating Article II, 12 of the Oklahoma Constitution?
 3. May a state law enforcement officer enforce tribal law onlands within tribal jurisdiction pursuant to a tribal-statecooperative agreement under 74 O.S. 1221 (1990) withoutoffending the dual-office holding prohibition of Article II,Section 12 of the State Constitution?
 4. May a state police officer investigate the commission of afederal or tribal crime in Indian country while awaiting thearrival of federal or tribal officials?
 INTRODUCTION
¶ 1 These issues have recently come again to the forefront in the State of Oklahoma since the decision of Ross v. Neff,905 F.2d 1349 (10th Cir. 1990).
¶ 2 In Ross, a Cherokee man sued the Adair County, Oklahoma, sheriff alleging that the sheriff had illegally arrested him at Greasy Ballpark in Adair County, which is situated on Cherokee trust land. Although the Tenth Circuit eventually held in that case that the sheriff was immune from liability because he believed he had jurisdiction on the area, and at the time of arrest "the law regarding the jurisdiction of local police officers on Indian Tribal Trust land in Oklahoma was not clearly established," the Court left open the subject of the county's possible liability. Ross, 905 F.2d at 1354.
¶ 3 Ross held that the State of Oklahoma, acting through the sheriff, had absolutely no jurisdiction to make the arrest at Greasy Ballpark. The fact that the sheriff may have been called to the park by tribal officials in no way alleviated the jurisdictional problem. Although recognizing that their ruling could create a "lawless" area, the Court stated:
 [E]ven if both the federal government and the Cherokee tribe have abdicated responsibility for law enforcement at the Greasy Ballpark, this void does not empower Oklahoma or Adair County to assume general criminal jurisdiction simply because it is the nearest police authority.
Ross, 905 F.2d at 1353. Jurisdiction over Greasy Ballpark would have been with the federal government or with the Cherokee tribe.
 CRIMINAL JURISDICTION IN INDIAN COUNTRY
¶ 4 Prior to the Indian Civil Rights Act of 1968, the State could have assumed jurisdiction over all Indian country merely by legislative act. In 1953, it was suggested by the Department of Interior that Oklahoma consider assuming such jurisdiction over Indian lands under Public Law 280. Oklahoma declined to do so, and since the passage of the Indian Civil Rights Act, permission of the tribes is now a necessary prerequisite to the State assuming criminal jurisdiction over Indian country. UnitedStates v. Burnett, 777 F.2d 593 (10th Cir. 1985), cert. den.476 U.S. 1106, 106 S.Ct. 1952, 90 L.Ed.2d 361 (1986). No Oklahoma tribes have granted such permission to the State.
¶ 5 Indian country is defined in 18 U.S.C.A. 1151 (1982), as:
 (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,
 (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
 (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
¶ 6 Oklahoma is unique in that it does not have any large contiguous tracts of Indian land, such as are found on the reservation areas in Arizona and New Mexico. Eastern Oklahoma, particularly, is a virtual checkerboard of restricted and unrestricted land. There are no signposts for law enforcement authorities telling them when they leave state jurisdiction and enter Indian country.
¶ 7 According to the Major Crimes Act, certain crimes committed by Indians in "Indian country" are within the exclusive jurisdiction of the federal government. That federal statute provides:
 (a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under 74 O.S. 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United states.
 (b) Any offense referred to in subjection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.
18 U.S.C.A. 1153 (Supp. 1984).
¶ 8 It must be emphasized that state courts retain jurisdiction, in Indian country, over crimes committed by a non-Indian against the person or property of a non-Indian.Williams v. United States, 327 U.S. 711 (1946); Draper v.United States, 164 U.S. 240 (1896); United States v.McBratney, 104 U.S. 621 (1882). Therefore, Indian country should not be treated by state law enforcement officers as a "no-man's land," over which they have absolutely no authority.
¶ 9 Jurisdiction over Indian country is tripartite. Over each tract of land which falls into the legal classification of Indian country under 18 U.S.C.A. 1151 (1982) three separate sovereigns retain a portion of criminal jurisdiction over the area. Those sovereigns are the United States of America, the state, and the tribe.
¶ 10 Cross-deputization between the federal government and the state does not solve the problem where jurisdiction properly belongs to the tribe. Cross-deputization between the state and one tribe does not bestow jurisdiction over a crime committed on another tribe's land. Duro v. Reina, 495 U.S. ___,110 S.Ct. 1737, 109 L.Ed;2d 693 (1990). The Duro case held that one Indian tribe has no jurisdiction over a crime committed by an Indian of another tribe, even though the crime occurs on the first tribe's land.[1]
¶ 11 In broad general terms, the division of jurisdiction can be described thus:
 1. Crimes committed by or against Indians which fall into the category of major crimes under 18 U.S.C.A. 1153 (Supp. 1983) or are elsewhere specifically included under the auspices of the federal government by statute, are under the exclusive province of the United States of America. Williams, 327 U.S. at 713, 714; Donnelly v. United States, 228 U.S. 243
(1913).
 2. Crimes not specifically allocated to the federal government's jurisdiction by statute, typically more minor crimes committed by Indians, fall under the exclusive jurisdiction of the tribal government. United States v. Johnson, 637 F.2d 1224, 1231 (9th Cir. 1980).
 3. Crimes committed by non-Indians against the person or property of another non-Indian are within the exclusive jurisdiction of the state. McBratney,
supra; Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).
¶ 12 Your questions presented here seek to discover whether cross-deputization agreements among these three separate sovereigns are permitted under Oklahoma law.
 I.
¶ 13 The first question that must be addressed is: Regardless of whether a state police officer holds a cross deputization agreement, does he or she have the authority to arrest an Indian for the commission of a federal crime in Indian country within the State of Oklahoma? This question refers to category one as outlined above, i.e., crimes committed by or against Indians which are specifically included under the jurisdiction of the United States. The Ross v. Neff case, it should be remembered, dealt with the offense of public intoxication, which is not one of the major crimes under the Major Crimes Act, and therefore was properly under the auspices of tribal, and not federal law. Thus, that case provides little guidance to this question.
¶ 14 Although the general rule is that state officers can arrest for federal offenses, United States v. DiRe,332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), United States v. Janik,723 F.2d 537, 548 (7th Cir. 1983), that general rule is not applicable in Indian country.
¶ 15 In Langley v. Ryder, 778 F.2d 1092 (5th Cir. 1985) certain Indians who had been arrested on state gambling charges moved for injunctive relief in federal court, seeking to restrain Louisiana officials from prosecuting them in state court. The arrest took place in Indian country of the Coushatta Tribe. The defendants also moved to have their arrest warrants quashed in state court. The federal district court granted injunctive relief, holding that the federal government had jurisdiction over the land in question. The Fifth Circuit affirmed the holding of the federal district court, stating:
 Since Louisiana is not a P.L. 280 state, there is no effective congressional grant of jurisdiction to Louisiana within Indian country. Thus, the general rule that the federal, not state, government has criminal jurisdiction over Indian lands applies.
Langley, 778 F.2d at 1096.
¶ 16 It should be remembered that the Langley case did not deal with a conviction, but an ongoing criminal prosecution. The effect of the federal court's injunction was to stop the state criminal prosecution, resulting in a de facto suppression of the arrest of the defendants.
¶ 17 California v. Cabazon Band of Indians 480 U.S. 202,107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) dealt with whether the State of California[2] had jurisdiction to regulate certain types of gambling on reservation land.[3] The Supreme Court noted, in passing, that "there is no warrant for California to make arrests on reservations." Ibid, 480 U.S. at 214. In a footnote the court also observed that:
 If state officers discover a gambling business unknown to federal authorities while performing their duties authorized by Pub L 280, there should be ample time for them to inform federal authorities, who would then determine whether investigation or other enforcement action was appropriate. A federal police officer is assigned by the Department of the Interior to patrol the Indian reservations in southern California.
Ibid, n. 16.
¶ 18 The Court's notation makes it clear that the Court presumes that the state officers would not have jurisdiction to make an arrest without at least the accompaniment of a Department of the Interior officer.
¶ 19 Additionally, in the case of Provancial v. UnitedStates, 454 F.2d 72 (8th Cir. 1972), the Eighth Circuit noted that two municipal officers were acting under the authority of Deputy Special Officer commissions from the BIA when they arrested Provancial. The Court stated:
 Each of them was a deputized special officer of the Department of Interior, Bureau of Indian Affairs. Each thereby held a special commission granting him power to arrest Indians within the Indian Reservation. In their capacity as employees of the City of Mission they did not possess the power to arrest lndians within the Indian Reservation.
Provancial, 454 F.2d at 75.
¶ 20 The Langley, Cabazon Band and Provancial cases present the clear inference that state and local law enforcement authorities do not have the jurisdiction to make arrests on Indian country for federal offenses.
 II.
¶ 21 The second question asks whether it is constitutionally permissible for state law enforcement officers to enter into cross-deputization agreements with the federal government, i.e., the Bureau of Indian Affairs. Would such agreements violate the constitutional prohibition against dual office holding found in Article II, Section 12 of the Oklahoma Constitution?
¶ 22 The cross-deputization agreements proposed by the Bureau of Indian Affairs are generally referred to as Deputy Special Officer agreements or commissions (hereinafter "DSOs"), and are provided for by federal statute. That statute has been recently revised and expanded into the Indian Law Enforcement Reform Act which was signed into law on August 18, 1990. 25 U.S.C.A. 2801, et seq. (Supp. 1990).
¶ 23 The proposed agreements would partially alleviate the jurisdictional problem summarized in category one of the tripartite jurisdiction, as outlined above. A cross deputization agreement with the federal government would allow state and local law enforcement officers to operate under the shelter of federal authority in making arrests, executing searches, etc., on Indian country. In no way would such a DSO bestow state jurisdiction over the crime for the purposes of prosecution. A state or local police officer who arrested an individual for the commission of a federal crime would have to turn that individual over to the appropriate federal authorities. The crime must still be prosecuted in the appropriate sovereign's tribunal, and according to that sovereign's laws.
¶ 24 Article II, Section 12 of the Oklahoma Constitution states:
 No member of Congress from this State, or person holding any office of trust or profit under the laws of any other State, or of the United States, shall hold any office of trust or profit under the laws of this State.
¶ 25 It is this provision which has presented a hurdle to the "cross-deputization" of State officers with the federal government. See e.g., A.G. Opin. No. 84-108 and A.G. Opin. No. 78-176.
¶ 26 Section 2804 of the Indian Law Enforcement Reform Act provides:
 (a) Agreements for use of personnel or facilities of Federal, tribal, State, or other government agency
 The Secretary may enter into an agreement for the use (with or without reimbursements of the personnel or facilities of a Federal, tribal, State, or other government agency to aid in the enforcement or carrying out in Indian country of a law of either the United States or an Indian tribe that has authorized the Secretary to enforce tribal laws. The Secretary may authorize a law enforcement officer of such an agency to perform any activity the Secretary may authorize under section 2803 of this title.
 (c) Limitations on use of personnel of non-Federal agency
 The Secretary may not use the personnel of a non-Federal agency under this section in an area of Indian country if the Indian tribe having jurisdiction over such area of Indian country has adopted a resolution objecting to the use of the personnel of such agency. The Secretary shall consult with Indian tribes before entering into any agreement under subsection (a) of this section with a non-Federal agency that will provide personnel for use in any area under the jurisdiction of such Indian tribes.
* * *
 (f) Status of person not otherwise a Federal employee
 While acting under authority granted by the Secretary under subsection (a) of this section, a person who is not otherwise a Federal employee shall be considered to be —
 (1) an employee of the Department of the Interior only for purposes of —
 (A) the provisions of law described in section 5 O.S. 3374(c)(2), and
(B) 18 O.S. 111 and 18 O.S. 1114, and
 (2) an eligible officer under subchapter III of chapter 81 of Title 5.
¶ 27 The Act does not actually create a federal position or office. It permits the Secretary to enter into agreements with other governmental agencies to use the employees of those agencies. It further empowers the Secretary to permit these officers to conduct additional activities which, absent such agreement, the officers would be powerless to carry out. While the Act permits the officer to be treated as a federal employee in certain limited instances,[4] these exceptions appear to be for the purpose of protecting the "non-federal" officer. In fact, the legislation makes it clear that the officers are not federal employees for all purposes.
¶ 28 Under this limited authority, and under the restrictions provided in 2804, it is clear that the non-federal law enforcement officer does not hold an "office of trust" for the United States. Holders of the DSOs provided for in 2804 do not hold an office created by the constitution or statutes, which is normally an essential element of the traditional definition of an officer, as defined by Oklahoma law.[5]
¶ 29 We find that the proposed DSO's do not convey an office of trust under the United States. Because an officer possessing a "DSO" under the federal statute does not take on a new position or office, we hold that a DSO from the Bureau of Indian Affairs does not constitute an "office of trust or profit" as defined in Article II, Section 12 of the Oklahoma Constitution.
¶ 30 Therefore, having reasoned that because a DSO or cross-deputization agreement as provided for in the Indian Law Enforcement Reform Act, 25 U.S.C.A. 2804, does not convey a federal office of trust, we find that state law enforcement officers may accept Deputy Special Officer Commissions from the Bureau of Indian Affairs without offending the dual office holding prohibition of Article II, Section 12 of the Oklahoma Constitution.
¶ 31 A.G. Opin. No. 84-108 is hereby withdrawn, and A.G. Opin. No. 79-216 is hereby modified to the extent that it held there was no Indian country in Oklahoma.
 III.
¶ 32 Your third question asks whether a state law enforcement officer may enforce tribal laws on lands within tribal jurisdiction pursuant to a tribal-state cooperative agreement under 74 O.S. 1221 (1990) without offending the dual-office holding prohibition of Article II, Section 12 of the State Constitution. This question refers to category two in the tripartite jurisdiction general outline, above.
¶ 33 Assuming that the tribal-state cooperative agreements would parallel the state/federal agreements above, no new office would be created, and thus the intent of the constitutional provision against dual office holding would not be offended.[6] Cooperative agreements between the tribes and the State of Oklahoma have been granted state approval by 74O.S. 1221 (1990), and are desirable in an effort to provide unified law enforcement across the State of Oklahoma for all citizens.
¶ 34 This opinion only addresses whether the proposed tribal/state agreements violate Article II, Section 12. We hold that they do not.[7]
¶ 35 Therefore, in answer to your third question, a state law enforcement officer may enforce tribal law on lands within tribal jurisdiction pursuant to a tribal-state cooperative agreement under 74 O.S. 1221 (1990), without offending the dual-office holding prohibition of Article II, Section 12 of the State Constitution. Such agreements should be patterned after the federal legislation which authorizes DSO's to insure that there is absolutely no question about a new office being created.
 IV.
¶ 36 Your fourth question asks if a state police officer may investigate the commission of a federal or tribal crime in Indian country while awaiting the arrival of federal or tribal law enforcement officials. This question refers to categories one and two of the three-part jurisdictional outline found at the beginning of this opinion.
¶ 37 Your attention is directed to A.G. Opin. No. 77-180 which addresses when a municipal officer may investigate crimes outside of his jurisdiction (the municipality). That opinion stated:
 The power to arrest, search and seize is vested in the municipal officers of this state. That power or authority, unless enlarged by statute, ceases at the corporate boundaries of the employing municipality. He may, however, investigate the commission of a crime outside the jurisdiction but is vested with no more authority than a private citizen in terms of the compelled production of evidence under color of authority, whether it be demonstrative or oral.
¶ 38 The legislature has provided for the "loaning" of law enforcement officers from municipalities to other municipalities, and to state law enforcement agencies. 11 O.S. 34-103 (1990).But see, Guthrie v. State, 668 P.2d 1147 (Okl.Cr. 1983).
¶ 39 If the officer could legally investigate the commission of the crime in the first instance, the fact that he is in Indian country does not affect the validity of his investigation. Certain state law enforcement officers have jurisdiction throughout the entire state, which includes Indian country. The fact that the State of Oklahoma may not have jurisdiction over certain crimes which occur in Indian country does not mean that the law enforcement officer does not have a right to be there.
¶ 40 The state law enforcement officer would not have the authority of a police officer to investigate crimes within the jurisdiction of the federal or tribal government, but would only have the authority of a private citizen. He could not serve process, or make arrests under color of authority. He would have only the authority of a private citizen, which is what any municipal officer would have when conducting an investigation outside his municipality.
¶ 41 Thus, in the absence of an appropriate DSO, a state law enforcement officer may only investigate a federal or tribal crime inside Indian country as a private person, and cannot serve process, or operate as a law enforcement officer in making arrests, etc.
 CONCLUSION ¶ 42 It is, therefore, the official opinion of the AttorneyGeneral that:
 1. Absent a cross-deputization agreement between the State orlocal agency and the appropriate federal agency, a lawenforcement officer of the State or local agency does not havethe jurisdiction to make an arrest for a violation of a federallaw which occurs in Indian country.
 2. There is no constitutional prohibition under Article II,Section 12 of the Oklahoma Constitution to the acceptance bystate or local law enforcement officers of cross-deputizationagreements from the Bureau of Indian Affairs as provided for in25 U.S.C.A. 2804 (Supp. 1990) because such intergovernmentalagreements create no federal office.
 3. A state law enforcement officer may enforce tribal law onlands within tribal jurisdiction pursuant to a tribal-statecooperative agreement under 74 O.S. 1221 (1990) withoutoffending Article II, Section 12 of the Oklahoma Constitution,where the agreement creates no new office but only increases theauthority of state and local officers to enforce tribal laws.
 4. Absent an appropriate cross-deputization agreement, a statelaw enforcement officer may investigate a federal or tribal crimeinside Indian country, but does so with only the authority of aprivate citizen. A.G. Opin. No. 77-180.
 A.G. Opin. No. 84-108 is hereby withdrawn and A.G.Opin. No.79-216 is hereby modified to correspond to the findings of thisopinion.
ROBERT H. HENRY ATTORNEY GENERAL OF OKLAHOMA
A. DIANE HAMMONS ASSISTANT ATTORNEY GENERAL
[1] The effect of the Duro v. Reina case has been somewhat nullified by the amendment of 25 U.S.C. § 1301 (2) (1982) which was signed into law by President bush on November 5, 1990. That law is in effect until September 30, 1991, and gives tribes criminal jurisdiction over Indians of other tribes. After September 30, it is unclear whether one tribe will have jurisdiction over an Indian of another tribe.
[2] California, together with five other states, adopted Public Law 280 and thus has criminal jurisdiction over offenses committed by or against Indians within all Indian country within the state.
[3] Even under Public Law 280, there are limitations over state criminal jurisdiction in Indian country.
[4] The exceptions listed in the Code provide that holders of those agreements may receive certain insurance benefits if necessary, receive protection under the Federal Tort Claims Act, and are treated as federal law enforcement officers for the purpose of criminal prosecution of anyone who attacks them while they are operating under the DSO, 25 U.S.C. §§ 2804 (f).Provancial v. United States, 454 F.2d 72 (8th Cir. 1972).
[5] Wimberly v. Deacon, 144 P.2d 447 (Okla. 1944); Battiestv. State, 744 P.2d 688 (Okl.Cr. 1988); Grand Jury of McCurtainCounty v. Cecil, 679 P.2d 1308 (Okl.App. 1983); City of Tulsav. District Court of Tulsa County, 51 P.2d 511 (Okla. 1935).
[6] Furthermore, art. II, § 12 prohibits anyone who holds an office of trust or profit "under the laws of any other state, or of the United States," from holding an office of trust in Oklahoma. Because Indian tribes are not states, nor arms of the United States, it is doubtful that tribal officers fall within the parameters of art. II, § 12.
[7] A.G. Opin. No. 84-108, which is being withdrawn in this opinion, held that a state law enforcement officer could not accept a commission as a federal or Indian tribal police officer. That opinion effectively held that Indian tribal peace officers are employees of the Bureau of Indian Affairs, and are consequently officers of trust under the federal government. That conclusion cannot be supported based on existing case law.United State v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079,55 L.Ed.2d 303 (1978); Worcester v. Georgia, 31 U.S. 515, 559,8 L.Ed. 483 (1832); Evans v. McKay, 869 F.2d 1341 (9th Cir. 1989) Native American Church v. Navajo Tribal Council,272 F.2d 131 (10th Cir. 1959).
A few days before the issuance of this Opinion, the United States Supreme Court decided the case of Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, Case No. 89-1322, (February 26, 1991). In this case the Court reiterated the principle of tribal sovereignty, and refused to retreat from that position. Indian tribes are sovereign entities, and their tribal police officers are not mere agents of the federal government.