905 F.2d 1349
 Ronnie ROSS, Plaintiff-Appellant,
v.
Russell NEFF, in his Official Capacity as Sheriff of Adair
County, Oklahoma; Billy Jack McLemore, individually and in
his Official Capacity; and County of Adair, Oklahoma, a
political subdivision of the State of Oklahoma, Defendants-Appellees.
 No. 88-1404.
 United States Court of Appeals,
Tenth Circuit.
 June 4, 1990.
Rehearing Denied July 19, 1990.
 
 Joseph C. Self of Sexton Law Firm, Fort Smith, Ark., for plaintiff-appellant.
 Mark Green of Green and Green, Muskogee, Okl., for defendant-appellee.
 Before LOGAN, MOORE, and ANDERSON, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiff Ronnie Ross brought two separate Fourth Amendment based claims against the defendants Deputy Billy Jack McLemore, Sheriff Russell Neff and Adair County, Oklahoma, pursuant to 42 U.S.C. Sec. 1983.[1] In one, Ross alleges that defendants violated Ross' rights when McLemore illegally arrested him on Indian Tribal Trust land, because Oklahoma peace officers have no jurisdiction in Indian country. Second, Ross asserts an independent constitutional claim based on McLemore's alleged use of excessive force in making the arrest. He argues that the county was party to both violations: the first because it was its custom or policy to allow officers to make arrests in Indian country; and the second because of its failure to train and supervise McLemore and its custom and policy allowing its deputies access to and use of firearms.
 
 
 2
 The trial court directed a verdict in favor of the county. After an initial trial ending in a mistrial, Deputy McLemore eventually prevailed on a jury verdict.[2] The central issue on appeal is whether the district court erred as a matter of law in holding that McLemore was acting within his jurisdiction when he arrested Ross. This holding, of course, entirely removed Ross' Sec. 1983 claim based on the allegedly extra-jurisdictional arrest from the jury's consideration. We conclude that the court did err. We hold, however, that McLemore was entitled to qualified immunity on this claim, and that the court's error did not taint the jury verdict on the excessive force claim. Furthermore, the directed verdict in favor of the county on the excessive force claim was proper. Accordingly, we remand only the extrajurisdictional arrest claim against the county for trial.[3]
 
 I Background Facts
 
 3
 Plaintiff Ross, a Cherokee Indian, spent most of the day of July 4, 1986, with friends and relatives at the W.W. Keller Ballpark (a/k/a Greasy Ballpark) in Adair County, Oklahoma. The Greasy Ballpark is located on Cherokee Indian Tribal Trust land. The land was then under a five-year lease, approved by the local office of the Bureau of Indian Affairs, to the South Greasy Community Park Association. The record does not reflect whether the Association is a tribal organization, although its president, Mose Killer, is a Cherokee Tribe member.
 
 
 4
 Sometime in the early evening of July 4, 1986, Killer called the Adair County Sheriff's Department to request that the police "make an appearance" at the park. III R. 56. He testified that he was concerned that some people were driving too quickly down the driveway to exit the ballpark grounds; he was also concerned about traffic on the driveway being blocked by persons loitering and drinking beer at the ballpark after the end of the day's activities.
 
 
 5
 Deputy McLemore reported to the ballpark, where he attempted to arrest Ross for public intoxication. The evidence is disputed whether Ross resisted arrest. We need not resolve the factual conflict, however, to decide the legal question at issue.[4] In any event, an altercation occurred during which McLemore shot Ross in the leg, which later required amputation.
 
 II Jurisdiction to Arrest
 
 6
 The deputy's jurisdiction to arrest is an issue of law which we review de novo. See, e.g., In re Tri-State Equipment, Inc., 792 F.2d 967, 970 (10th Cir.1986).
 
 
 7
 Land held in trust for Indian use, like the Greasy Ballpark, is "Indian country" as that term is defined in 18 U.S.C. Sec. 1151. United States v. John, 437 U.S. 634, 648-49, 98 S.Ct. 2541, 2548-49, 57 L.Ed.2d 489 (1978); Cheyenne-Arapaho Tribes v. Oklahoma, 618 F.2d 665, 668 (10th Cir.1980). Indian country is subject to exclusive federal or tribal criminal jurisdiction "[e]xcept as otherwise expressly provided by law." 18 U.S.C. Sec. 1152. Congress has granted general criminal jurisdiction to some states over Indian country within their borders, see, e.g., 18 U.S.C. Secs. 1162 (various states), 3243 (Kansas), but no such provision has been made for Oklahoma. Congress has also provided, now in 25 U.S.C. Sec. 1321, "a statutory method by which a state, with the consent of the tribe, can assume jurisdiction over Indian country." United States v. Burnett, 777 F.2d 593, 597 (10th Cir.1985). Oklahoma, however, has not acted to assume jurisdiction by this method. See Citizens Band Potawatomi Indian Tribe v. Oklahoma Tax Commission, 888 F.2d 1303, 1307 (10th Cir.1989); Burnett, 777 F.2d at 597; State v. Klindt, 782 P.2d 401, 403 (Okla.Crim.App.1989). If there has been no express delegation of jurisdiction to the state, a fortiori, there has been no grant of local jurisdiction. Because the state of Oklahoma has neither received by express grant nor acted pursuant to congressional authorization to assume criminal jurisdiction over this Indian country, Adair County, its sheriff, and its subordinate police officers had no jurisdiction to arrest Ross at the Greasy Ballpark. See United States v. Baker, 894 F.2d 1144, 1146 (10th Cir.1990) (county district court exceeded its authority in issuing search warrant for property within Indian country).
 
 
 8
 Defendants argue that, despite the plain language of 18 U.S.C. Sec. 1152, a state may assert criminal jurisdiction over Indians in Indian country whenever such action would not undermine tribal or federal interests. On numerous occasions the Supreme Court has stated that "even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973) (citing cases). Such statements, however, have uniformly been made in civil cases, in connection with a determination that paramount federal law does not expressly exclude state jurisdiction. See, e.g., Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959) ("Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.") (emphasis added). Congress has provided, however, for exclusive federal jurisdiction over crimes committed by Indians in Indian country, through the broad reach of 18 U.S.C. Secs. 13 (allowing federal enforcement, on federal enclaves, of state and local laws, such as the public intoxication ordinance involved here), 1152, and 1153. There is no question but that 18 U.S.C. Sec. 13 would allow federal enforcement of the local ordinance against public intoxication involved in this case. See In re Denetclaw, 83 Ariz. 299, 320 P.2d 697, 700-01 (1958). The "borrowing" provision of this act, however, does not grant states independent authority to enforce their own laws over Indians on Indian land. See Cohen's Handbook of Federal Indian Law 379-80 (R. Strickland ed. 1982) (hereinafter Cohen ); United States v. New Mexico, 590 F.2d 323, 329 (10th Cir.1978), cert. denied, 444 U.S. 832, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). The Supreme Court has expressly stated that state criminal jurisdiction in Indian country is limited to crimes committed "by non-Indians against non-Indians ... and victimless crimes by non-Indians." Solem v. Bartlett, 465 U.S. 463, 465 n. 2, 104 S.Ct. 1161, 1163 n. 2, 79 L.Ed.2d 443 (1984).
 
 
 9
 Defendants also urge this court to recognize state criminal jurisdiction over the Greasy Ballpark, lest the park become "a land in which there is no law." Brief of Appellees at 4 (quoting statement of trial judge, IV R. at 247). We cannot tell from the record whether either the federal government or the Cherokee tribe have officers who police this Indian country. But even if both the federal government and the Cherokee tribe have abdicated responsibility for law enforcement at the Greasy Ballpark, this void does not empower Oklahoma or Adair County to assume general criminal jurisdiction simply because it is the nearest police authority. Avenues to extended jurisdiction must come from the legislature, not from the courts and not from the fiat of county governments.
 
 
 10
 In In re Denetclaw, a somewhat similar case, the Arizona Supreme Court addressed the issue of whether the state could enforce traffic ordinances against Indians on highways within the boundaries of the reservation. The Denetclaw court held that, pursuant to 18 U.S.C. Sec. 13, "federal jurisdiction over offenses, either felonies or misdemeanors, committed by an Indian in Indian country is exclusive and not concurrent with state jurisdiction." 320 P.2d at 700. The court, therefore, discharged the Indian defendant because the state lacked jurisdiction to make the traffic stop. The court recognized the "jurisdictional gap" that was being left but stated,
 
 
 11
 "[w]e are bound to follow the law as we find it irrespective of the apparent 'void' this will leave in safeguarding the rights of the traveling public. At present the State Highway Patrol and Sheriff's deputies are, insofar as we know, the only agencies patrolling county and state highways that cross Indian lands ... It is further well known that the federal officers neither police nor attempt to prosecute traffic violations by Indians on our highways under the Assimilative Crimes Act, although unquestionably the federal courts would have jurisdiction over such offenses.... We might ask what procedure is left to remove drunk and reckless Indian drivers from state highways lying on the reservation and punish them for traffic violations? The answer appears to be the tribal policeman and the tribal courts.... We are uninformed as to whether any Navajo tribal ordinances are in effect that cover such offenses."
 
 
 12
 Id. at 701. Accord C.M.G. v. State, 594 P.2d 798, 804 (Okla.Crim.App.1979).
 
 
 13
 Accordingly, the district court erred in concluding that state authorities have criminal jurisdiction over the ballpark.
 
 III
 
 14
 We must now consider the consequences of the district court's error with respect to each of Ross' Sec. 1983 claims and each of the defendants herein.
 
 A Illegal Arrest--Qualified Immunity[5]
 
 15
 We have implied that an arrest made outside of the arresting officer's jurisdiction violates the Fourth Amendment to the Constitution and is therefore actionable pursuant to 42 U.S.C. Sec. 1983 under the appropriate circumstances. Smith v. City of Oklahoma City, 696 F.2d 784 (10th Cir.1983). We now so hold expressly.[6] A warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause. See Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir.1985) (warrantless arrest without probable cause is constitutionally invalid); Hinshaw v. Doffer, 785 F.2d 1260, 1266 (5th Cir.1986) (same). Absent exigent circumstances, such an arrest is presumptively unreasonable. Michigan v. Summers, 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981).[7]
 
 
 16
 Police officers, however, sued in their individual capacity, are entitled to qualified immunity when they could not reasonably have known that their challenged actions violated the law. Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." (citations deleted)).
 
 
 17
 At the time Ross was arrested, the law regarding the jurisdiction of local police officers on Indian Tribal Trust land in Oklahoma was not clearly established. Broad language in Supreme Court opinions, some of which we have quoted above, gave the appearance of allowing state intervention when it was determined that such intervention would not compromise tribal or federal interests. See Mescalero Apache Tribe, 411 U.S. at 148, 93 S.Ct. at 1270; Organized Village of Kake v. Egan, 369 U.S. 60, 67-68, 82 S.Ct. 562, 566-67, 7 L.Ed.2d 573 (1962); Williams, 358 U.S. at 220, 79 S.Ct. at 270. See also Cohen at 277-78 ("[S]tate laws otherwise preempted because of interference with tribal self-government may apply" in Indian country not near settled Indian communities). Although we have discussed above why these cases are not applicable to the issue of state criminal jurisdiction, the question was confused enough at the time of trial that the district court, after its own research on the matter, thought that the county sheriff's office could enforce state law at the Greasy Ballpark: "I conclude frankly that the officer had a right to be there, and ... it is undisputed that they believed completely that they had that right, and the law is so unsettled that the qualified privilege should be applied." IV R. 252-53. "I don't think that these lands are outlaw lands and that you've got to call the FBI before anybody can do anything on them ... I don't think that's the status of these lands." Id. at 261.
 
 
 18
 Taking these factors into consideration, we hold as a matter of law that a reasonable county officer, executing the law at the time Ross was arrested, would not have known that he was prohibited from making an arrest in the Greasy Ballpark. Therefore, McLemore is entitled to qualified immunity and cannot be held liable for his extra-jurisdictional arrest of Ross, per se. The issue of his liability for use of excessive force, of course, is a separate matter.
 
 
 19
 Regardless of the state of the law at the time the arrest took place, however, the qualified immunity defense is not available to the county. Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); Valdez v. City and County of Denver, 878 F.2d 1285, 1287 n. 2 (10th Cir.1989). The county can be held liable, of course, only for constitutional deprivations resulting from county "custom or policy." Oklahoma City v. Tuttle, 471 U.S. 808, 817, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985). The sheriff testified that he had no policy with respect to the Indian country, because he was not aware of any Indian trust land in the county. III R. 66. Nevertheless, he clearly believed the arrests were legal; his testimony would permit the jury to find a custom or policy to allow county officers to make arrests at the Greasy Ballpark. Therefore, the directed verdict in the county's favor was error, and this claim must be remanded for trial.
 
 B Excessive Force
 
 20
 Ross' action against defendants for use of excessive force in effecting the arrest is separate and distinct from the issue of the legality of the arrest per se. The issue of McLemore's use of excessive force was submitted to the jury, which found in his favor. Ross argues that the jury should have been instructed that McLemore was acting outside of his jurisdiction at the time he effected the arrest. Under the circumstances of this case, we fail to see how McLemore's lack of jurisdiction would affect the issue of the appropriate use of force in executing the arrest.
 
 
 21
 The use of force in effecting an arrest is to be evaluated under the standard enunciated by the Supreme Court in Graham v. Connor, --- U.S. ----, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The objective standard laid out by the Supreme Court requires that a court weigh all circumstances known to the officer, or which he reasonably should have known at the time of the arrest, in evaluating his use of force. Id. 109 S.Ct. at 1872. Because we have held that a reasonable officer would not have known that he lacked jurisdiction for arrests at the Greasy Ballpark, and because no evidence was introduced that McLemore in fact knew that he lacked jurisdiction, the lack of jurisdiction was not a circumstance for the jury to consider in evaluating Ross' excessive force claim.
 
 
 22
 The district court's directed verdict in favor of the county necessarily included the excessive force claim. The county can be held liable only for deprivations of constitutional rights resulting from "custom or policy." Oklahoma City v. Tuttle, 471 U.S. at 817, 105 S.Ct. at 2433. Ross made no showing of a policy or custom of improper training, supervision or use of arms. Therefore, the directed verdict in favor of Adair County on this claim was proper.
 
 C
 
 23
 Accordingly, the decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for retrial of the Sec. 1983 extra-jurisdictional arrest claim against Adair County. On remand, the county may not be held liable for the consequences of the alleged excessive force.
 
 
 
 [1]
 Although the pleadings and briefs are far from clear, we think plaintiff's complaint and later pleadings may be fairly read to state two separate causes of action. Ross premises his claims, at least in part, on the Due Process Clause of the Fourteenth Amendment. Because the Supreme Court has recently made clear that excessive force claims that are based on objections to an arrest should be analyzed under the specific provisions of the Fourth Amendment, rather than more general "substantive due process" provisions, see Graham v. Connor, --- U.S. ----, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989), we will analyze Ross' claims under the Fourth Amendment as made applicable to the states through the Fourteenth Amendment
 The suits against McLemore and Adair County Sheriff Russell Neff in their official capacities we consider to be simply suits against the county. See Varela v. Jones, 746 F.2d 1413, 1418 (10th Cir.1984) ("[W]e treat suits against city officials in their official capacities as suits against the city."). Accordingly, we make no further mention in this opinion of Sheriff Neff except as a witness, and the discussion of McLemore, except when he is acting as representative of the county, relates to the suit against him in his individual capacity only.
 
 
 [2]
 Our review of this case is hampered by gaps in the record, including a failure of the parties to designate transcripts from the second trial. Because the only issue on appeal arising out of the excessive force claim deals with the trial court's refusal to instruct the jury that McLemore was outside his jurisdiction when he made the arrest, we are able to resolve the case without reference to the second trial transcript
 
 
 [3]
 The parties waived oral argument; therefore, the case was submitted on the briefs
 
 
 [4]
 The record before us does not reflect whether Ross was charged with or convicted of public intoxication or resisting arrest, or whether he was even formally arrested. The Supreme Court has recently held, however, that the intentional use of deadly force to stop a suspect constitutes a seizure for the purpose of Fourth Amendment analysis. See Brower v. Inyo, 489 U.S. 593, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). Therefore, we will analyze this case as though Ross had been formally arrested
 
 
 [5]
 The issue of good faith immunity was not briefed on appeal, and therefore arguably was not preserved for our consideration. We consider the issue, however, because the district court made specific legal holdings with regard to qualified immunity and charged the jury with respect to McLemore's qualified immunity defense, and we may affirm the court below on any grounds supported by the record. Colorado Flying Academy, Inc. v. United States, 724 F.2d 871, 880 (10th Cir.1984)
 
 
 [6]
 We do not in this opinion intend to cast doubt upon the constitutional validity of extra-jurisdictional arrests made by police officers in "hot pursuit."
 
 
 [7]
 Our decision is not undermined by the fact that McLemore was technically an invitee of Mose Killer at the time he made the arrest. McLemore was clearly acting in his capacity as a deputy sheriff when he made the arrest. There is no evidence that Mose Killer had the authority to extend the jurisdiction of Adair County into Indian trust land by cross-deputizing county officers. See Blatchford v. Sullivan, 904 F.2d 542, 548 n. 5 (10th Cir.1990); United States v. Reid, 517 F.2d 953, 963 (2d Cir.1975) (noting that local sheriffs may be cross-deputized by the Indian tribes)