The **UNITED KEETOOWAH BAND OF CHEROKEE INDIANS,**
Plaintiff-Appellant,

v.

The **STATE OF OKLAHOMA, ex rel. Davis MOSS, District Attorney of Tulsa County, Defendants-Appellees.**

No. 87-2797.

United States Court of Appeals, Tenth Circuit.

March 14, 1991.

Martin E. Seneca, Jr., Reston, Va., for plaintiff-appellant.

M. Denise Graham, Asst. Dist. Atty., Tulsa, Okl., for defendants-appellees.

Before HOLLOWAY, Chief Judge, and McWILLIAMS and BRORBY, Circuit Judges.

HOLLOWAY, Chief Judge.

## I

Plaintiff–Appellant, United Keetoowah Band of Cherokee Indians ("UKB" or "tribe"), appeals the final judgment, permanent injunction and order entered by the United States District Court for the Northern District of Oklahoma.[1] The district court's order enjoined the tribe from further operation of its Horseshoe Bend Bingo hall, a high stakes bingo enterprise, situated on a restricted Indian allotment.

This action arose in response to efforts by the State of Oklahoma to enforce its gaming laws against Horseshoe Bend Bingo. The hall is located on a leased portion of property owned by the plaintiff, Cordelia Tyner,[2] who at the behest of her son, George Washington, granted permission to construct and operate gaming on her land.

In October of 1986, the District Attorney for Tulsa County obtained a search warrant covering the Horseshoe Bend Bingo hall in order to seize gambling paraphernalia. Under the warrant the Tulsa County sheriff entered the premises and confiscated boxes of "pull tabs" and other gaming material allegedly used in violation of Okla-

---

1. The judgment was entered on October 29, 1987; however on motion of both parties, a clarification of this judgment and its accompanying orders was entered by the court on November 20, 1987. Notice of appeal was filed December 1, 1987, by the UKB and is considered timely under Fed.R.App.P. 4.

2. Cordelia Tyner apparently has also been referred to in these proceedings under the names of Cordelia Tyner McKee and Cordelia Tyner Washington. To avoid confusion, this court will follow the lead of the district court and refer to her as "Mrs. Tyner."

homa's gambling laws.[3] The State brought suit in state court seeking to enjoin Washington, and others involved in the management and operation of Horseshoe Bend Bingo, from operation of the enterprise as violative of Okla.Stat. tit. 21, §§ 995.1–995.18 (1981 & Supp.1986).[4] In response, the UKB and Mrs. Tyner brought the instant action in federal court, seeking a declaratory judgment that the State was without jurisdiction to enforce its laws on the restricted allotment, and an injunction against all pending and future proceedings by the State under its gambling laws. Mrs. Tyner was dismissed from the suit, *see* Order, dated April 29, 1987, and that decision is not appealed.

The State counterclaimed, requesting a declaration of its jurisdiction over the restricted allotment, and seeking an injunction pursuant to Title 25, U.S.C. § 81 against further operation of the game until it was brought into compliance with federal law.[5] Bench trial proceedings were conducted in June and September of 1987. On October 29, 1987, the district court issued detailed Findings of Fact ("FF") and Conclusions of Law ("CL"). The following day, the court permanently enjoined the State from exercising criminal jurisdiction over the allotment, and likewise enjoined the UKB from further operation of gaming activities on the Tyner allotment. *See* Amended Permanent Injunction, dated October 30, 1987. The following additional facts were found by the district court and are not in dispute:

Mrs. Tyner, an enrolled member of the Cherokee Nation of Oklahoma, was allotted a parcel of real property by the Cherokee Nation in 1905. This land is a restricted Indian allotment.[6] Mrs. Tyner has twelve children, among them, George Washington and Rachel Dake. Washington received permission from his mother to construct and operate a bingo enterprise on a portion of her restricted allotment. To that end, Washington invested $10,000 of his own money, and further obtained partial financing by promissory notes given to family and friends. These notes provided for a 100% return-on-investment with repayment completed within 120 days. Washington also hired Gary Allen, a non-Indian, to serve as accountant for the bingo enterprise.

After unsuccessfully approaching the Delaware and Cherokee Nation tribes, Washington approached plaintiff UKB to obtain its participation in, and assertion of tribal sovereign power over, the bingo venture. In June 1986, the UKB's Tribal Council agreed to lease some of Mrs. Tyner's allotment and participate in the bingo enterprise. Some time later, Washington and some of his siblings joined the UKB.[7] On August 1, 1986, a lease was executed between the UKB and Mrs. Tyner for part

---

**3.** The investigation of the enterprise was apparently also motivated by complaints of loud noise by the enterprise's electrical generator, and concerns of the local citizenry about the increased traffic, the use of untrained, armed security personnel, and inadequate sewage facilities used by patrons.

**4.** Oklahoma permits bingo gaming, but regulates it through eligibility requirements, licensing, and limitations on hours, sessions per day, and prize amounts. Conducting "pull-tab game[s]" in places where bingo is played is expressly prohibited. *See id.* at § 995.15.

**5.** Title 25, U.S.C. § 81 (1958), entitled "Contracts with Indian tribes or Indians," requires that all contracts with Indian tribes (or individual Indians not citizens of the U.S.) regarding their land are void unless approved by both the Secretary of the Interior and the Commissioner of Indian Affairs. The statute specifies that:

All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe ... in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States[.]

**6.** The district court held that Mrs. Tyner's restricted allotment is Indian country as defined by 18 U.S.C. § 1151, for purposes of both criminal and civil jurisdiction. *See* CL Nos. 4–9. The State does not question this ruling.

**7.** The UKB asserts that Mrs. Tyner is also a member of the UKB, with enrollment # 6178. The court below noted that "Mrs. Tyner testified she was not a Keetoowah." *See* FF No. 9. For purposes of this decision, it need only be noted that all parties agree that Mrs. Tyner is an enrolled member of the Cherokee Nation of Oklahoma.

of her allotment for the purpose of conducting "commercial businesses, including bingo, food service, giftshop and related recreational businesses[.]" *See* Brief of Appellee, Addendum D. The lease was submitted to the Bureau of Indian Affairs ("BIA") for approval, but no action by BIA was ever taken.

The bingo enterprise, denominated Horseshoe Bend Bingo, opened to the public on October 23, 1986. Gaming at the hall included bingo, keno, and the sale of pull tabs. Washington was general manager. Keetoowahs comprised the majority of the employees; however, members of the Tyner family were given preferential hiring over all others. One-fourth of the employees were members of the Tyner family, including all twelve of Mrs. Tyner's children. Allen was the only non-Indian employed.

Several months after the bingo hall's opening, Washington was elected to the Tribal Council. He enjoyed substantial power over the bingo venture, including hiring decisions, and shared with Dake the oversight of all bank accounts which serviced funds by and for the enterprise. Washington, however, is the only member of the UKB Tribal Council with signatory authority on the bank accounts. No tribal representatives supervise the counting procedures at Horseshoe Bend Bingo.

Under a verbal agreement between Mrs. Tyner and the UKB, Mrs. Tyner was to receive 90% of the net profits, the remaining 10% going to the UKB for the first six months of operations or until Mrs. Tyner received $232,000. Thereafter, under a Joint Venture Agreement ("JVA") between Mrs. Tyner and the UKB, the percentages changed to 75% and 25%, respectively. As defined by the JVA, net profit is any money remaining after the payment of operating expenses, including salaries and debt service on the promissory notes. The JVA was never submitted to the BIA for approval. Prior to the district court's injunction, Mrs. Tyner had received very little money, and the UKB had received only $10,600 as an "advance" on profits.

## II

■ As a threshold matter, the State raises a jurisdictional question. The State charges that the district court lacked subject matter jurisdiction over this cause under 28 U.S.C. § 1362, citing *Enterprise Electric Co. v. Blackfeet Tribe of Indians,* 353 F.Supp. 991 (D.Mont.1973).[8] There a Montana corporation sued the tribe for money due under a contract for electrical work on a tribal center. The district court dismissed, holding that § 1362 provides limited jurisdiction in actions brought by an Indian tribe. Neither the opinion in *Blackfeet Tribe,* nor the State's argument based on it explain why § 1362 does not cover this matter other than to assert that the Act's scope is "limited." We are persuaded that an action such as this by a tribe asserting its immunity from the enforcement of state laws is a controversy within § 1362 jurisdiction as a matter arising under the Constitution, treaties or laws of the United States. *See Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 472–73, 96 S.Ct. 1634, 1640–41, 48 L.Ed.2d 96 (1976); *Seminole Tribe of Florida v. Butterworth,* 491 F.Supp. 1015, 1017–18 (S.D.Fla.1980), *aff'd on other grounds,* 658 F.2d 310 (5th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138; *Cheyenne-*

---

**8.** 28 U.S.C. § 1362 (1966), entitled "Indian tribes," reads in full:

The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

Although it is unclear from the record whether the State raised this issue to the court below, the district court affirmatively asserted jurisdiction pursuant to this section. *See* CL No. 1 (a typographical error, which designates jurisdiction pursuant to "§ 1962" here obviously was intended to read "§ 1362"). Nevertheless, we reach this question because the issue of subject matter jurisdiction may be raised at any time, *see Kain v. Winslow Mfg., Inc.,* 736 F.2d 606, 609 (10th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1360, 84 L.Ed.2d 381 (1985), even when the defendant has not raised the issue by cross-appeal. *Pytlik v. Professional Resources, Ltd.,* 887 F.2d 1371, 1380 (10th Cir.1989).

*Arapaho Tribes v. State of Oklahoma,* 618 F.2d 665, 666 (10th Cir.1980).

■ The State's argument implies that by incorporating, the UKB no longer functions as a "tribe" for purposes of § 1362. *See* Appellee's Brief at 9–11. True, the UKB is a federally chartered corporation,[9] but as the district court correctly noted, "the formulation [sic] of the corporation does not affect the power of the tribe to act in a governmental capacity." CL No. 14, citing *Cohen's Handbook of Federal Indian Law,* Ch. 6, Sec. A4c (Strickland, ed. 1982). There is no indication in the pleadings or briefs that the tribe comes before the federal court in any manner other than as a sovereign entity, and the plain language of § 1362 applies to "any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior[.]" The Department of the Interior expressly recognizes the UKB as a governing body. *See* Department of Interior Notice, Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 53 Fed.Reg. 52829–02 (1988).

In sum, § 1362 serves as an adequate jurisdictional grant for this Indian gaming case where the tribe asserts its claim of immunity from state regulation. *See, e.g., Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,* 743 F.Supp. 645, 646 (D.Wis.1990).

## III

### A

Our remaining analysis is shaped significantly by the State's election not to appeal

any substantive aspect of the decision below. Adversely to the State, the district court ruled that "Oklahoma has no criminal jurisdiction over the [Tyner] restricted allotment," CL No. 16, and that the State's counterclaim is without merit because "[a] lease of third party lands is insufficient to state a claim under 25 U.S.C. § 81." CL No. 18 (citation omitted). Since the State has not cross-appealed, these decisions restrict the scope of this appeal so that the State and the district attorney of Tulsa County now come before this Court purporting only to enforce federal, and not Oklahoma, laws.[10] Furthermore, the State's election not to appeal necessarily limits the State's arguments to supporting application of the Assimilative Crimes Act, 18 U.S.C. § 13—the only other federal law expressly at issue in the record below. *See, e.g., Swarb v. Lennox,* 405 U.S. 191, 201, 92 S.Ct. 767, 772, 31 L.Ed.2d 138 (1972) ("In the absence of a cross appeal, the opposition is in no position to attack those portions of the District Court's judgment that are favorable to the plaintiff-appellants"); *compare, Dandridge v. Williams,* 397 U.S. 471, 475–76 n. 6, 90 S.Ct. 1153, 1156–57 n. 6, 25 L.Ed.2d 491 (1970) ("[A]ppellee may, without taking a cross-appeal, urge in support of a decree any matter *appearing in the record* ") (emphasis added).

By contrast, however, the UKB here takes issue with the following district court Conclusions of Law:

CL No. 10 holds that although the Tyner allotment is Indian Country for purposes of civil and criminal matters, the UKB may not exercise tribal sovereignty over the

---

**9.** The Keetoowahs are a federally recognized band of Indians pursuant to Act of Congress, 60 Stat. 976 (1946), and thus, are permitted to organize as a corporate entity under the Oklahoma Indian Welfare Act, 49 Stat. 1967 (1936). Also, the United Keetoowah is recognized by the BIA as possessing sovereign powers. *See* CL No. 17.

**10.** *See, e.g., Snell v. Tunnell,* 920 F.2d 673 (10th Cir.1990) (An appellate court, hearing only an appeal of some of the issues decided below, lacks jurisdiction "to decide an issue when the party adversely affected ha[s] not [cross] appealed the adverse order"); *First Nat'l Bank of Den-*

*ver v. Denver United States Bank,* 409 F.2d 108, 110 (10th Cir.1969) (Where appellants appeal only part of the judgment below, appellees who "did not cross-appeal ... cannot now expand the narrow issue presented by appellants").

Indeed, as noted in the State's brief, Oklahoma is "not appealing that portion of the Court's order. Rather, the District Attorney is responding to Appellant's Brief solely for the purpose of providing this Court with sufficient information to enable this Court to make a well-informed decision in this appeal." Appellee's Brief at 8, n. 1.

land because the tribe's ability to exercise tribal sovereignty is preconditioned on the existence of tribal lands.

CL No. 13 holds that Horseshoe Bend Bingo is not a "tribal enterprise" because the factors enumerated in *Indian Country, U.S.A., Inc. v. Oklahoma,* 829 F.2d 967, 982–83 (10th Cir.1987), *cert. denied sub nom. Oklahoma Tax Comm'n v. Muskogee (Creek) Nation,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988), have not been satisfied. Specifically, the court noted that the tribe receives only minimal benefits from the enterprise, and neither the lease nor the JVA were approved by the BIA as required under *Indian Country, U.S.A.*

CL Nos. 16 and 17 hold that the failure of the UKB to establish: (1) entitlement to assert sovereign power over the Tyner allotment; (2) that the venture is a tribal enterprise; and, (3) that federal rules governing operation of Indian bingo establishments have been complied with, permits the assertion of federal jurisdiction pursuant to the Assimilative Crimes Act, 18 U.S.C. § 13. Under the incorporated terms of this federal law, the operation of bingo, pull tab sales, and keno at Horseshoe Bend Bingo is illegal. Accordingly, the court permanently enjoined UKB "and all persons connected with the gaming activities of Horseshoe Bend Bingo ... from conducting, operating, managing or participating in any further gaming activities" at the facility on the Tyner restricted allotment.

Amended Permanent Injunction of Oct. 30, 1987, at 2.

Although the UKB takes issue with all of these conclusions, claiming a misapplication of federal policy by the district court and the unfairness and inadequacy of the *Indian Country, U.S.A.* test as applied to unlanded Indian tribes, we believe that the UKB is entitled to relief based only on its last claim. There the UKB asserts that the district court erred by enjoining the tribe, enforcing state law as federal law through application of the Assimilative Crimes Act, 102 Stat. 4381, codified at 18 U.S.C. § 13 (as amended 1988) ("ACA" or "§ 13").[11] Due to subsequent intercession by Congress, noted below, the UKB is entitled to the lifting of this injunction.

■ Where it applies, the ACA incorporates state criminal law as the substantive content of federal law. Thus, the district court's ruling incorporated the limitations prescribed on state-approved bingo contained in Okla.Stat. tit. 21, §§ 995.1–995.18 (1981 & Supp.1986), as the governing *federal* law. Although the State was without authority to enforce these laws of their own weight, *see* CL Nos. 15 and 16, the district court implicitly accepted the State's application for the injunction as one on behalf of the United States and enjoined the Bingo enterprise under federal law.[12]

Had the *status quo* remained intact, following the decision below, this court would have been required to decide whether the ACA did, in fact, incorporate Oklahoma's

---

11. In relevant part, § 13 reads:

(a) Whoever within or upon any [federal enclave] ..., is guilty of any act or omission which, *although not made punishable by any enactment of Congress,* would be punishable if committed or omitted within the jurisdiction of the State ... in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

(emphasis added). The ACA is applicable to Indian country through, and as limited by, the General Crimes Act, 18 U.S.C. § 1152 (1982). *See Iowa Tribe of Indians v. Kansas,* 787 F.2d 1434, 1437 (10th Cir.1986); *Cheyenne–Arapaho Tribes of Oklahoma v. Oklahoma,* 618 F.2d 665, 668 (10th Cir.1980).

12. As required by § 81, the State's counterclaim sought an injunction "on behalf of the United States[.]" *See* 25 U.S.C. § 81, reproduced in part at footnote 5. The district court, however, elected to enjoin the tribe pursuant to the ACA. *See* CL No. 17. In its answer brief, the State raises as an issue of error the district court's decision not to assert jurisdiction pursuant to § 81. Yet there is no claim that the amended permanent injunction's provisions should be other, or different, than those actually imposed by the district court. Since the contours of the equitable relief granted is in no manner different under either statute, and since the State has not contested the district court's rejection of its § 81 monetary claim, we find it unnecessary to reach the merits of this argument.

bingo laws.[13] But significantly, there has been a dispositive change in the *exact* law governing this case since the decision below was rendered. As a result, the incorporation issue, and others raised on this appeal have become moot.[14]

**B**

■ It appears that a new day has dawned with respect to the regulation of Indian bingo, heralded by congressional enactment of the Indian Gaming Regulatory Act, 102 Stat. 2467 (1988) (codified at 25 U.S.C. §§ 2701–2721 and 18 U.S.C. §§ 1166–1168 (1988)) ("IGRA"). A fair reading of IGRA leads inexorably to the conclusion that this Act now bars federal courts from enjoining Indian bingo by application of state law through the ACA. Accordingly, the injunction against the UKB must be lifted.

The few cases that have construed IGRA describe it as "establish[ing] a comprehensive scheme for the regulation of gaming on Indian lands." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 743 F.Supp. 645, 648 (D.Wis. 1990); *Sisseton–Wahpeton Sioux Tribe v. United States Department of Justice*, 718 F.Supp. 755, 758 (D.S.D.1989), *rev'd on other grounds*, 897 F.2d 358 (8th Cir.1990) ("IGRA is a comprehensive and pervasive piece of legislation that in many respects preempts other federal laws that might apply to gaming"). Of particular relevance is the congressional finding that:

> Indian tribes have the exclusive right to regulate gaming activity on Indian lands [defined to include restricted Indian allotments] if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

**13.** This issue is not without controversy, regarding both the ultimate decision and the manner of resolution. At least one district and one appellate court have applied the civil-regulatory/criminal-prohibitory test to the ACA. *See, e.g., Pueblo of Santa Ana v. Hodel*, 663 F.Supp. 1300 (D.D.C.1987) (holding that New Mexico's gambling laws on horse racing were regulatory and thus inapplicable to the reservation; however, state laws on greyhound racing were deemed prohibitory and were incorporated into federal law by the ACA); *United States v. Marcyes*, 557 F.2d 1361, 1364 (9th Cir.1977) (deciding that Washington's fireworks laws were prohibitory and therefore applied to Indian reservations through the ACA). Such analyses assume that only those state laws deemed "prohibitory" in nature are incorporated. *See generally Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (holding that Public Law 280, a jurisdictional statute, permits application of criminal, but not non-private civil, state laws to Indian lands in the subject states); *Marcyes*, 557 F.2d at 1364 (noting "a strong argument exists that Congress did not intend to include the penal provisions of a state regulatory system within the ACA").

The circuits, however, have divided on the question whether this test should apply outside the context of Public Law 280 cases. *See, e.g., Iowa Tribe of Indians v. Kansas*, 787 F.2d 1434, 1435–36 n. 1 (10th Cir.1986) (implicitly approving the test's application in an ACA context); *Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982) (applying the test to OCCA cases), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Marcyes*, 557 F.2d 1361 (9th Cir.

1977) (applying the test to the ACA); *but see United States v. Dakota*, 796 F.2d 186 (6th Cir. 1986) (limiting application of the test to Public Law 280 cases). We need not reach these questions, however, to resolve this case as indicated in the remainder of this opinion.

**14.** Recently, in *Ross v. Neff*, 905 F.2d 1349, 1353 (10th Cir.1990), plaintiff Ross brought an action pursuant to 42 U.S.C. § 1983, *inter alia*, against Adair County, Oklahoma, for gunshot injuries he sustained during his arrest for public intoxication by a county sheriff at a ballpark on Indian land. The district court, ruling for the county, removed Ross' claim of alleged extrajurisdictional arrest from the jury's consideration. *Id.* at 1351. On appeal, this court reversed, holding that "[t]he 'borrowing' provision of [the ACA] ... does not grant states independent authority to enforce their own laws over Indians on Indian land." Similarly, in *Indian Country, U.S.A.*, 829 F.2d 967 (10th Cir.1987), this court determined that Oklahoma's bingo laws were preempted from application in Indian country within Oklahoma. *Id.* at 981–82. However, the *Indian Country, U.S.A.* case, unlike *Neff*, did not discuss state assertions of jurisdiction by way of "incorporated" federal law.

Although coming in the context of a civil case, this court is mindful that the *Neff* holding explicitly addressed only the application of Oklahoma's criminal law in Indian country, and not the quasi-criminal regulation invoked as to bingo. In tandem with *Indian Country, U.S.A.*, the extension of *Neff* to cover this case might arguably be justifiable.

IGRA, § 2701(5). Gaming over which the federal government holds jurisdiction (primarily "class II" gaming discussed below) is subject to the supervision of a newly created, independent regulatory authority—the National Indian Gaming Commission—established to "meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." IGRA, § 2702(3); § 2704.

The Act divides Indian gaming into three categories which differ as to the extent of federal, tribal and state oversight. Class I gaming covers the traditional Indian social games played in connection with "tribal ceremonies or celebrations." IGRA § 2703(6). Under the Act, such gaming falls "within the exclusive jurisdiction of the Indian tribes[.]" *Id.* at § 2710(a)(1). Class II gaming covers bingo, "including (if played in the same location) pull-tabs, ... and other games similar to bingo[.]"[15] *Id.* at § 2703(7)(A)(i). Such gaming falls "within the jurisdiction of the Indian tribes," but also remains subject to federal oversight as established by the chapter. *Id.* at § 2710(a)(2). Class III gaming encompasses "all forms of gaming that are not class I gaming or class II gaming[,]" *id.* at § 2703(8), and requires that such games be: (1) authorized by tribal ordinance; (2) located in a State which permits such gaming to some extent; and, (3) "conducted in conformance with a Tribal–State compact[.]" *Id.* at 2710(d)(1). This compact is the mechanism whereby a State, by agreement with the tribe, might assume either civil and/or criminal jurisdiction, and apply its laws or regulations over Indian country. *See id.* at § 2710(d)(3)(C).

Like the ACA, IGRA's penal provision, 18 U.S.C. § 1166, incorporates state laws as the federal law governing all nonconforming gambling in Indian country. *See* § 1166(a). Wider in scope than the ACA, § 1166(a) makes "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to the criminal sanctions applicable thereto" enforceable in Indian country. *Id.*

Where IGRA most differs from ACA, however, is that the power to enforce these newly incorporated laws rests solely with the United States: "The United States shall have *exclusive* jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country...." *Id.* at § 1166(d) (emphasis added). Nowhere does the statute indicate that the State may, on its own or on behalf of the federal government, seek to impose criminal or other sanctions against an allegedly unlawful tribal bingo game.

Indeed, the very structure of the IGRA permits assertion of state civil or criminal jurisdiction over Indian gaming *only* when a tribal-state compact has been reached to regulate class III gaming. *See Lac du Flambeau Band,* 743 F.Supp. at 646 ("Unless and until the state negotiates a tribal-state compact in which [the tribe] consents to the exercise of such jurisdiction, the United States has the exclusive authority to enforce violations of state gambling laws on plaintiff's reservations"). The statute appears to leave no other direct role for such State gaming enforcement.[16] The few cases that have construed the IGRA to date are not to the contrary.

In *Lac du Flambeau Band,* a tribe operating a casino on its reservation sued the State of Wisconsin and several state offi-

---

**15.** Presumably also keno, a bingo variant, which was played at Horseshoe Bend Bingo hall.

**16.** This court does not, and need not, decide, whether a state may seek an injunction against a tribal bingo operation under other federal laws, such as § 81. In passing, however, it is clear that Congress intends that the newly created Commission fill the paramount role in overseeing Indian contracts governed by § 81. *See* IGRA, § 2711(h) (transferring the oversight of Indian gaming management contracts covered by § 81 from the Secretary of the Interior to the Commission). The use of § 81 as a sword against the tribes is a questionable practice, as it plainly was intended to shield them. *See, e.g., Potawatomi Indian Tribe of Oklahoma v. Enterprise Management Consultants, Inc.,* 734 F.Supp. 455, 456–57 (D.Okla.1990) ("Section 81 is designed to protect Indians from entering into improvident and unconscionable contracts with non-Indians") (quotation omitted). Moreover, the application of § 81 to an Indian–to–Indian contract may itself be doubtful. As indicated, though, there is no § 81 issue before this court.

cers, pursuant to IGRA, to enjoin any future state prosecutions. The federal district court concluded that Wisconsin was without authority to prosecute violations of its gambling laws on the plaintiff tribe's reservation, either through Public Law 280,[17] or through IGRA, because the state had not negotiated such jurisdiction with the tribe through a tribal-state compact. *See id.*, 743 F.Supp. at 646. Although the court declined to issue the injunction because the tribe was unable to satisfy the irreparable injury requirement, *see id.* at 654–55, it found any state criminal jurisdiction preempted:

> Even if the state had not lost its Pub.L. 280 jurisdiction to prosecute violations of state gambling laws in Indian country, the passage of the Indian Gaming Regulatory Act has preempted it from exercising criminal jurisdiction over gambling activities on the reservations in the absence of a tribal-state compact that confers such authority on the state by agreement. 18 U.S.C. § 1166(d) gives the United States "exclusive jurisdiction . . . ."

*Id.* at 652 (quoting IGRA).

In *United States v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358 (8th Cir.1990), the tribe had sought declaratory and injunctive relief regarding the validity, under IGRA, of its blackjack gaming operations on its South Dakota reservation. The tribe asserted that its blackjack operation, normally class III gaming, fell within IGRA's "grandfather clause" which classified certain pre-existing Indian enterprises as class II. *See* IGRA, § 2703(7)(C). Reversing the district court, which found the grandfather clause inapplicable and the games improper under either class II or class III, the Eighth Circuit stated:

> We are convinced that Congress intended that class II gaming be subject to tribal and federal oversight, and that the states' regulatory role be limited to overseeing class III gaming, pursuant to a Tribal-State compact. Permitting South Dakota to apply its substantive law to the blackjack game here, which is properly classified as class II gaming, conflicts with congressional intent.

*Sisseton–Wahpeton Sioux Tribe*, 897 F.2d at 364. Although neither *Sisseton–Wahpeton Sioux Tribe*, nor *Lac du Flambeau Band* are ACA cases, they clearly show that Congress has limited the states' enforcement role to class III gaming conducted under a compact. *Compare Mashantucket Pequot Tribe v. Connecticut*, 737 F.Supp. 169, 173 (D.Conn.), *aff'd*, 913 F.2d 1024 (2d Cir.1990) (stating that IGRA's "legislative history notes that the provisions regarding class II gaming, primarily bingo, were intended to be consistent with the tribal rights recognized in *Cabazon*").[18]

---

**17.** Act of Aug. 15, 1953, ch. 505, 67 Stat. 588 (Public Law 280) (codified as amended at 18 U.S.C. § 1162; 25 U.S.C. §§ 1321–1326; 28 U.S.C. § 1360 (1982 & Supp.1985)). Public Law 280 originally permitted states to assume civil and criminal jurisdiction within Indian country by amending or deleting state constitutional or statutory barriers to such assumption, and then passing affirmative legislation to so assume jurisdiction. *See generally*, Note, *Indian Sovereignty versus Oklahoma's Gambling Laws*, 20 Tulsa L.J. 605, 612–21 (1985) (discussing the problems of Oklahoma's use of Public Law 280 to regulate Indian bingo). At the time of Public Law 280's passage in 1953, Oklahoma was listed among those States having barriers to assertion of jurisdiction. *See* S.Rep. No. 699, 1953 U.S.Code Cong. & Admin.News at 2409, 2412. There is no indication that Oklahoma has ever acted pursuant to this Act to assume jurisdiction. *See, e.g., Ross v. Neff*, 905 F.2d at 1352 (noting that Oklahoma "has not acted to assume jurisdiction by this method"); *Indian Country, U.S.A.*, 829 F.2d

at 980 and n. 6 (noting Oklahoma's official stance that Public Law 280 was thought unnecessary for state assertions of jurisdiction in Indian country); *Confederated Bands & Tribes of Yakima Indian Nation v. Washington*, 550 F.2d 443, 445 n. 3 (9th Cir.1977) (listing Oklahoma as one of ten states yet to have acted pursuant to Public Law 280), *rev'd on appeal after remand*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979).

**18.** This reference is to the Supreme Court's pre-IGRA ruling in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). As noted by the district court in *Mashantucket, Cabazon* "held that tribes have a right to conduct gaming on Indian lands without state regulation if located in a state which permits, subject to regulation, the gaming." 737 F.Supp. at 174. Oklahoma regulates, but does not prohibit bingo. *See Indian Country, U.S.A.*, 829 F.2d at 972.

The legislative history also supports the view that IGRA was intended to preempt state assertions of prosecutorial authority over Indian bingo through the ACA:

The mechanism for facilitating the unusal [sic] relationship in which a tribe might affirmatively seek extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-state compact. In no instance, does S. 555 [enacted as IGRA] contemplate the extension of State jurisdiction or the application of State laws for any other purpose.

> .        .        .        .        .

S. 555 is intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed.

S.Rep. No. 100–446, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.Code Cong. and Admin.News 3071, 3075–76. The legislative history addresses Oklahoma's status under IGRA by explaining that:

There are five States ... that criminally prohibit any type of gaming, including bingo. S. 555 bars any tribe within those States, as a matter of Federal law, from operating bingo or any other type of gaming. *In the other 45 States [including Oklahoma], some forms of bingo are permitted and tribes with Indian lands in those States are free to operate bingo on Indian lands, subject to the regulatory scheme set forth in the bill.*

*Id.* at 3081–82 (emphasis added) (the bracketed language "[including Oklahoma]" was added by us). And specifically addressing the use of the ACA in the context of class II gaming, IGRA's Senate Report states:

The phrase "not otherwise prohibited by Federal Law" refers to gaming that utilizes mechanical devices as defined in 15 U.S.C. 1175. That section prohibits gambling devices on Indian lands but does not apply to devices used in connection with bingo and lotto. *It is the Committee's intent that with the passage of this act, no other Federal statute, such as*

*those listed below, will preclude the use of otherwise legal devices used solely in aid of or in conjunction with bingo or lotto or other such gaming on or off Indian lands. The Committee specifically notes the following sections in connection with this paragraph: 18 U.S.C. section 13[.]*

*Id.* at 3082 (emphasis added).

IGRA's statutory language, and this concise expression of congressional intent in the legislative history, almost make it mere surplusage to also reiterate the well established rule of construction noted by appellants: "[A]ny ambiguities in legislation enacted for the benefit of Indians will be construed in their favor." 134 Cong.Rec. H8153 (daily ed. Sept. 26, 1988) (Representative Udall's statement supporting S. 555 (IGRA)); *see also Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 759, 105 S.Ct. 2399, 2399, 85 L.Ed.2d 753 (1985) (same).

We are mindful of the views expressed in *United States v. Burns,* 725 F.Supp. 116 (D.N.Y.1989), *aff'd sub nom. United States v. Cook,* 922 F.2d 1026 (2d Cir.1991), but find their analyses distinguishable. There the defendants, members of the Mohawk tribe, were indicted, *inter alia,* on federal charges of conducting an illegal gambling business (operating slot machines) under 18 U.S.C. § 1955, and violation of IGRA's § 1166. The defendants argued that § 1955 had been preempted by IGRA and sought dismissal of the § 1955–based count. The district court rejected the preemption argument, noting that "the goals of 18 U.S.C. § 1166 and 1955 are distinct, and the argument that one must preempt the other on the basis of their similarity must fail." *Id.* at 124.

On appeal in *Cook,* the Second Circuit affirmed, using an "implicit repeal" analysis instead of a "preemption" one. *See Cook,* 922 F.2d at 1033, 1034. Although § 1955 and IGRA were viewed as "two acts on the same subject[,]" *id.* at 1033, the appellate court was unable to find the required "positive repugnancy between the [two acts'] provisions" necessary to find that IGRA repealed § 1955. *See id.* at

1033 (quoting *United States v. Batchelder*, 442 U.S. 114, 122, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979)). Finding that the statutes could be given independent, although somewhat overlapping, effect, the court concluded that "the provisions do not demonstrate the mutual exclusivity necessary to impute to Congress the clear, affirmative intent to repeal." *Id.* 922 F.2d at 1034. Neither the preemption analysis in *Burns*, nor the implicit repeal analysis on appeal in *Cook*, are persuasive here. Clearly, the *Burns* court's focus on the "distinct goals" between IGRA's § 1166 and § 1955 cannot be applied to § 1166 and the ACA—the ACA having no substantive goal other than to serve interstitially during congressional inaction. In fact, even though the *Burns* court did not accord full preemption to IGRA, it, too, scrutinized the senate report language quoted above (containing specific reference to the ACA) and found IGRA preemptive in "its potential application to class II gaming." *Burns* at 124. As for *Cook*, the implicit repeal approach used there cannot logically be applied to this case because by the passage of IGRA, Congress did not intend to "repeal" the ACA. Rather, as shown above, Congress sought to circumscribe its use by states against Indian gaming. Thus, the implicit repeal analysis is inapposite.[19]

Most importantly, however, is that the text and judicial construction of the ACA itself mandates that it no longer be available to Oklahoma here.[20] The ACA expressly applies to acts or omissions in Indian country "not made punishable by any enactment of Congress[.]" Such wording shows clear legislative intent. Accordingly, since first construed by the Supreme Court in *Williams v. United States*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946), the rule has been that the ACA can only apply where Congress has not spoken to the conduct proscribed. *See id.* at 723, 66 S.Ct. at 784 (noting that the ACA's legislative history shows "the Act was to cover crimes on which Congress had not legislated"); *see also United States v. Patmore*, 475 F.2d 752, 753 (10th Cir.1973) ("The Act has no application if such acts or omissions are made penal by federal statute."); *United States v. Marcyes*, 557 F.2d 1361, 1365 (9th Cir.1977) ("the Government can assimilate state law under the ACA only if no act of Congress makes such conduct punishable"); *United States v. Butler*, 541 F.2d 730, 734 (8th Cir.1976) ("the plain meaning of that Act requires that state law not be 'assimilated' where '*any* enactment of Congress' punished the conduct"). The *Williams* case involved direct application of this principle:

> If Congress had been satisfied to continue to apply local law to this and related offenses it would have been simple for it to have left the offense to the Assimilative Crimes Act. A contrary intent of Congress has been made obvious. Congress repeatedly has increased its list of specific prohibitions of related offenses and has enlarged the areas within which those prohibitions are applicable. It has covered the field with uniform federal legislation affecting areas within the jurisdiction of Congress.

*Id.*, 327 U.S. at 724, 66 S.Ct. at 784–85 (footnote omitted). So, too, in the area of Indian gaming, Congress has occupied the field, barring application of the ACA.

This court has interpreted the ACA in like manner. In *Cheyenne–Arapaho Tribes v. Oklahoma*, 618 F.2d 665 (10th Cir.1980), an Indian tribe sought to enjoin

---

**19.** Even were the ACA given continued substantive content, the injunction must still be lifted. As the most recent and more particular enactment of federal law, IGRA controls. *See FDIC v. Bank of Boulder*, 911 F.2d 1466, 1478 (10th Cir.1990) (en banc). By designating the United States' jurisdiction as "exclusive" over Indian gaming, Congress intended that no functionally equivalent power would remain in the states under such "pre-existing" federal law. Thus, insofar as the ACA previously provided an implicit cause of action to Oklahoma to attack the Horseshoe Bend Bingo enterprise, through the passage of IGRA's comprehensive enforcement scheme there exists the "mutual exclusivity necessary to impute to Congress the clear, affirmative intent to repeal" that part of the incorporated ACA. *Cf. Cook*, 922 F.2d at 1034.

**20.** Notably, one federal court has held that "Congress could have, but has not, provided for injunctive relief as a remedy for violations of ... the ACA." *United States v. Bay Mills Indian Community*, 692 F.Supp. 777, 780 (W.D.Mich. 1988), *vacated on other grounds*, 727 F.Supp. 1110 (W.D.Mich.1989).

the State from exercising its jurisdiction over hunting and fishing in Indian country. The district court had held that the state hunting and fishing laws applied to Indian country through the ACA. We disagreed and held that "[t]he Assimilative Crimes Act does not assimilate state law which is inconsistent with federal policies expressed in federal statutes." *Id.* at 668. Finding that Congress had "consistently protected the hunting and fishing rights of Indians" by treaty, we held parallel state laws inapplicable under the ACA. "It would be inconsistent to forbid states the right to control Indian hunting and fishing directly, and then to give that control back indirectly through the Assimilative [Crimes] Act." *Id.* at 668–69. Where, as in IGRA, Congress has restricted state jurisdiction over Indian gaming to that defined by a tribal-state compact, it would be equally inconsistent to permit the ACA-based injunction against the UKB to stand.

Here we note that IGRA came into existence after the state law was already incorporated by the ACA in this action. There is no reason, however, for this fortuity of timing to serve as a means for the State to continue to use the ACA to bypass the limitations on state jurisdiction imposed by IGRA. As noted in *Patmore*, "[t]he purpose of the [ACA] is to supplement the Criminal Code of the United States by adopting state criminal statutes relating to acts or omissions ... 'not made punishable by any enactment of Congress.'" *Id.* at 753. IGRA, however, now provides both civil and criminal sanctions for Indian gaming not in accordance with its provisions. *See* IGRA, 25 U.S.C. § 2713, 18 U.S.C. §§ 1166–1168. Congress has clearly occupied the regulatory field on Indian gaming. Although Oklahoma law was poured into the ACA as federal law by the district court, Congress has since poured in controlling federal law.[21]

Nor is it relevant that the prohibitions and penalties of Oklahoma law are differ-

ent, and possibly broader than those imposed by IGRA. Congress is certainly free to impose greater or lesser penalties than those contained in state law. *See Williams*, 327 U.S. at 723, 66 S.Ct. at 784 (the ACA was not intended to "enlarge or otherwise amend" definitions of federal crimes). As stated by the Eighth Circuit, "the legislative history [of IGRA] reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, the particular gaming activity." *Sisseton–Wahpeton*, 897 F.2d at 365 (footnote omitted).

Nor can it be said that Oklahoma's bingo laws fall within the exception in § 1166(d), *i.e.*, those laws which were not "made applicable under [that] section." *Id.* Such an argument would be specious in light of *Indian Country, U.S.A.*'s holding that Oklahoma's bingo laws are preempted as to Indian country, *id.* at 981–82, and the additional, unappealed rulings by the district court below that the Tyner allotment is Indian country and Oklahoma has no criminal jurisdiction over it. CL Nos. 9 & 16. This is not a case, like *Iowa Tribe*, 787 F.2d 1434 (10th Cir.1986), wherein Congress specifically delegated jurisdiction to the State. *See id.* at 1438–40 (holding that the Kansas Act conferred jurisdiction on Kansas over non-major state offenses, including gambling, committed on Indian reservations); *Ross v. Neff*, 905 F.2d 1349, 1352 (10th Cir.1990) ("Oklahoma has neither received by express grant nor acted pursuant to congressional authorization to assume criminal jurisdiction over this Indian country").

The United States is not before us. Oklahoma is.[22] Thus, although we would agree with the district court below on several of its findings and conclusions which

---

21. We are mindful that in grounding part of our disposition on IGRA, we are applying a new statute not briefed or argued to us. However, the necessary factual predicate is before us and we are convinced that the result we reach is

clearly indicated by the statute which Congress has now adopted.

22. We are pointedly aware of the Eleventh Amendment implications to our perception of this case. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Notably,

**1182**

are adverse to the tribe,[23] we must conclude that the appellant UKB is entitled to the equitable relief sought: the lifting of the injunction requested by the Tulsa County District Attorney. Accordingly, the injunction directed at the UKB and those assisting them in operation of the Horseshoe Bingo gaming venture is hereby VACATED. The amended permanent injunction enjoining the Tulsa County District Attorney, "and all persons acting ·in active concert with him or under his control[,]" as well as the declaratory judgment against the State of· Oklahoma, are AFFIRMED.

the relief obtained by the UKB in the district court consisted of a declaratory judgment against the State, CL No. 16, and a permanent injunction against the District Attorney for Tulsa County. There was no appeal by the State from the declaratory judgment. The caption designation of the defendant[s] reads: "The State of Oklahoma, ex rel. David Moss, District Attorney of Tulsa County." In both the brief and the pleadings, however, the "District Attorney" and "State" designations have been used interchangeably. *See, e.g.,* Answer and Counter-claim at 1 ("Comes now the State of Oklahoma"); Brief of Appellee at 10, 13, 14 (making assertions on behalf of "the State"); *id.* at 16 ("the District Attorney submits"). Nor is there any indication, of record, that the State Attorney General has sought formal appearance or intervention in this case. Accordingly, since the Tulsa County District Attorney has, all along, purported to represent the State, *see* CL Nos. 14, 16, 18, and no challenge has been made asserting otherwise, we perceive the State of Oklahoma as a party before us.

23. Specifically, we agree that the lease and the JVA both had to be approved by the Secretary under § 81, and since they were not, they are unenforceable. *See, e.g., A.K. Management Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785, 789 (9th Cir.1986) ("[A]n agreement without BIA approval must be null and void in its entirety"); *Armstrong v. Maple Leaf Apartments,* 508 F.2d 518, 525 (10th Cir.1974) ("An [Indian] deed without [the] requisite approval conveys no interest in the land").